655 P.2d 46

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Ernest Gene LaMERE,
Defendant-Appellant.**

No. 13305.

Supreme Court of Idaho.

Nov. 24, 1982.

Barry E. Watson, Wallace, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Leslie L. Goddard, Deputy Atty. Gen., Boise, for plaintiff-respondent.

DONALDSON, Justice.

The complaining witness, (hereinafter Carol), a fourteen-year-old junior high

school student, testified that she was baby-sitting for Rowena St. Mark when Rowena and the appellant, Mr. LaMere, returned early on the morning of October 23, 1978. Mr. LaMere walked Carol the short distance to her home and paid her for babysitting. He then returned to Rowena St. Mark's apartment.

Shortly after arriving home, Carol climbed out her bedroom window and returned to the apartment. Her reasons for returning and what happened at the apartment are in dispute, but in any event Carol and Mr. LaMere left in Rowena St. Mark's car to go to a nearby Circle K. Instead of going to the Circle K, the two went to a trailer in Smelterville and joined a group of people. After leaving the trailer, Carol testified that Mr. LaMere parked the car and proceeded against her will to have intercourse. He then drove her home and returned to Rowena St. Mark's apartment.

Upon arriving home Carol told her mother that she had been raped. The police were called and after talking with Carol and her parents a police officer went to Rowena St. Mark's apartment and took Mr. LaMere into custody. The appellant was charged with rape under I.C. § 18–6101.

The trial was held on March 5, 1979, and on March 7, 1979, the jury returned a verdict of guilty for the crime of statutory rape under I.C. § 18–6101(1).[1] On March 16, 1979, a motion for judgment of acquittal as well as a motion for a new trial were filed on behalf of the defendant. These motions were denied by the court.

After several continuances the defendant was sentenced to an indeterminate period of time not to exceed eight years in the custody of the Idaho State Board of Corrections. The appellant appeals both the conviction and the length of the sentence.

The appellant first alleges that the granting of the State's motion for leave to file an amended information on the eve of the trial violated the appellant's right of due process under the United States Constitution as well as his right under I.C. § 19–1420.[2] The appellant states that the facts in the information alleged the crime was to come within the purview of I.C. § 18–6101(3) and (4) of the statute, which cover forcible rape, and absolutely no allegations of age were made that could bring the conduct under subsection (1) which prohibits intercourse with a female under eighteen years of age. He argues that prejudicial error occurred because the request to amend the information to include facts alleging what is commonly referred to as statutory rape under subsection (1) came only one working day before the commencement of the trial.

At this stage of the proceeding Rule 7(d) of the Idaho Rules of Criminal Practice and Procedure[3] and I.C. § 19–1420 make the

---

1. "18–6101. RAPE DEFINED.—Rape is an act of sexual intercourse accomplished with a female under either of the following circumstances:

 1. Where the female is under the age of eighteen (18) years.
 2. Where she is incapable, through lunacy or any other unsoundness of mind, whether temporary or permanent, of giving legal consent.
 3. Where she resists but her resistance is overcome by force or violence.
 4. Where she is prevented from resistance by threats of immediate and great bodily harm, accompanied by apparent power of execution; or by any intoxicating narcotic, or anaesthetic substance administered by or with the privity of the accused.
 5. Where she is at the time unconscious of the nature of the act, and this is known to the accused.

 6. Where she submits under the belief that the person committing the act is her husband, and the belief is induced by artifice, pretense or concealment practiced by the accused, with intent to induce such belief."

2. "19–1420. AMENDMENT OF INDICTMENT.—An indictment or information may be amended by the prosecuting attorney without leave of the court, at any time before the defendant pleads, and at any time thereafter, in the discretion of the court, where it can be done without prejudice to the substantial rights of the defendant. An information or indictment cannot be amended so as to charge an offense other than that for which the defendant has been held to answer."

3. The Idaho Rules of Criminal Practice and Procedure were in effect at the time of this trial. Rule 7(d) is almost identical to the current I.C.R. 7(e).

matter of amending an information discretionary with the judge. In exercising his discretion, the judge must be sure that no substantial rights of the defendant are prejudiced. In absence of a showing of prejudice arising from the amendment, the defendant's argument is without merit. *State v. Owens,* 101 Idaho 632, 619 P.2d 787 (1980).

In a similar case, *People v. Collins,* 54 Cal.2d 57, 4 Cal.Rptr. 158, 351 P.2d 326 (1960), the defendants contended that they could not properly be convicted of statutory rape under an information charging them with forcible rape. Even though the information was never amended in *Collins* the court still held that there was "no indication whatever that defendants were prejudiced" because at the preliminary hearing it was proved the prosecuting witness was fifteen years of age. *Id.* 4 Cal.Rptr. at 160, 351 P.2d at 328. Also, it was not alleged that the defendants "would or could have disputed the age of the prosecuting witness." *Id.* 4 Cal.Rptr. at 160, 351 P.2d at 328.

In *State v. Gumm,* 99 Idaho 549, 585 P.2d 959 (1978), this Court stated that the defendant could not show prejudice arising from an amendment because he could not "legitimately contend that he was surprised to his substantial prejudice by the absence in the information of specific descriptions of the property which he had allegedly stolen. Defendant undoubtedly knew what articles the information referred to." *Id.* at 552, 585 P.2d at 962.

In this case, even though the amended information was not filed until shortly before trial, the defendant had been aware for some time that the victim was under eighteen years of age. At the preliminary hearing the victim was asked her age and she stated she was fourteen years old. The record also indicates that there were preliminary negotiations between the defense attorney and the prosecutor regarding a possible plea to statutory rape. Furthermore, the defendant did not make a claim that he could have disputed her age. Also, when requesting this amendment the prosecutor offered to continue the case in order for the defense to further prepare, but this offer was declined. Because the defendant had been aware of the victim's age before the filing of the amendment and did not make a claim that he could have disputed her age, we find the defendant's rights were not prejudiced from the amendment, and therefore, there was no abuse of discretion.[4]

The appellant next argues that I.C. § 18–6101 violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article 1, § 2 of the Idaho State Constitution. The appellant states that the statute violates equal protection since only males can be convicted of this crime.

When a challenge to a gender-based classification is raised this Court will follow the test set out by the U.S. Supreme Court and require that "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397, 407 (1976). This analysis requires that the State first set out its objectives for the statute and then show it has a strong interest in furthering those objectives. Finally, the State must prove

---

4. Justice Bistline argues in dissent that the amendment charges an offense other than that for which the defendant had been held to answer. The defendant argues on appeal only that his rights were prejudiced by the amendment and does not argue before this Court that the amendment charged a new offense. We agree with Justice Bistline's statement in *State v. Dennard,* 102 Idaho 824, 825, 642 P.2d 61, 62 (1982), that "[i]t is not the role of this Court to act as assistant attorney general, and we do not address the applicability of the rule." Neither should this Court act as a defense attorney. Even assuming that this argument was impliedly raised, we agree with the Court in *Collins, supra,* that "the subdivisions of section 261 [nearly identical to I.C. § 18–6101] do not state different offenses but merely define the different circumstances under which an act of intercourse constitutes the crime of rape." *Collins,* at 4 Cal.Rptr. at 160, 351 P.2d at 328. *See People v. Lohbauer,* 29 Cal.3d 364, 173 Cal. Rptr. 453, 627 P.2d 183 (Cal.1981).

that the classification bears a substantial relationship to the achievement of those objectives.

In the recent case of *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981), the United States Supreme Court upheld a California statutory rape statute. A plurality of the Court was satisfied with the California Supreme Court's finding that the prevention of illegitimate teenage pregnancies was at least one of the purposes behind the California statutory rape law. Because of the large number of teenage abortions, the increased medical risk associated with teenage pregnancy and the social consequences of teenage child bearing, the Court further found that the State had a strong interest in preventing such pregnancies.

The State in this case is also arguing that the prevention of teenage pregnancies is one of the main objectives behind I.C. § 18–6101, which is almost identical to the California statutory rape law. The State points out that statistics obtained from the Idaho Department of Health and Welfare and the Planned Parenthood Association of Idaho, Inc. show that in 1980 Idaho women gave birth to 20,140 children. Of those children, approximately 13% were born to mothers who were 19 years of age or less. Abortion statistics indicate that in both 1979 and 1980 approximately 30% of the legal abortions performed in Idaho were performed on girls who were between the ages of 10 and 19 years.

The State has shown a significant number of teenagers in this State do become pregnant each year and this Court recognizes the many problems associated with illegitimate teenage pregnancy. Therefore, we agree that the prevention of illegitimate teenage pregnancies is one of the objectives behind the statute and that the state has a strong interest in furthering this important governmental objective.

The appellant argues that the real purpose behind the law as it was passed in 1864

was not to prevent unwanted pregnancies, but rather, it was passed due to "out-moded" thinking of men about the chastity of women and their status as chattel. We agree with the Court in *Michael M., supra*, that "this court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Michael M.*, 101 S.Ct. at 1206 n. 7 (quoting *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968)).

The appellant next alleges that I.C. § 18–6103 [5] indicates the legislature was not concerned with the possibility of teenage pregnancy, and therefore, it was not one of the purposes behind the law. However, we find that I.C. § 18–6103 is not a statement of legislative intent, but rather, find that it refers to the quantum of evidence necessary to establish that an act of sexual intercourse has occurred.

After recognizing a legitimate purpose behind the statute and that the State has an interest in preventing unwanted pregnancy, it is then necessary to determine if the classification is substantially related to the achievement of that important governmental objective. The State is attempting to protect women from sexual intercourse at an age when the physical, emotional and psychological consequences of sexual activity are particularly severe. Because males alone can "physiologically cause the result which the law properly seeks to avoid," *Michael M.*, 101 S.Ct. at 1203, a law punishing a male for sexual intercourse with a teenager under the age of eighteen could certainly help deter this conduct. Therefore based on the above rationale, we hold that I.C. § 18–6101(1) is not unconstitutional as violative of the equal protection clauses of the Idaho State Constitution and the United States Constitution. *Michael M., supra; State v. Greensweig*, 103 Idaho 50, 644 P.2d 372 (Ct.App.1982).

The appellant next claims that the prosecutor made two improper comments in his closing argument which were calculated to

---

5. "18–6103. PENETRATION.—The essential guilt of rape consists in the outrage to the person and feelings of the female. Any sexual

penetration, however slight, is sufficient to complete the crime."

inflame the passions and prejudices of the jury. Firstly, the prosecutor alleged that the reason for the discrepancy between the victim's testimony concerning the color of the appellant's pants and their actual color was that the victim "is blue-green color blind." Secondly, the prosecutor stated that the defendant "took her virginity away from her."

We initially note that the defense counsel did not object to these remarks either during or on completion of the prosecutor's closing argument. The general rule in Idaho is that in absence of a timely objection to an alleged error at trial, an appellate court will not consider the alleged error on appeal. *State v. Sharp,* 101 Idaho 498, 616 P.2d 1034 (1980); *State v. Gish,* 87 Idaho 341, 393 P.2d 342 (1964); *State v. Spencer,* 74 Idaho 173, 258 P.2d 1147 (1953).

However, as stated in *Sharp,* under certain circumstances "the failure to object to closing arguments of a prosecuting attorney in a criminal case may not constitute a waiver of the objection." 101 Idaho at 503, 616 P.2d at 1039, (citing *Spencer, supra,* for the proposition). This Court further stated in *Sharp* that we will consider an alleged error, "where the record shows that the prosecuting attorney has been guilty of misconduct calculated to inflame the minds of jurors and arouse prejudice or passion against the accused by statements in his argument of facts not proved by evidence, ..." 101 Idaho at 503, 616 P.2d at 1039 (quoting *Spencer,* 74 Idaho at 183–84, 258 P.2d at 1154).

With this exception in mind it must also be noted that the prosecutor is normally given considerable latitude in his argument. He has the right to discuss the evidence and the inferences and the deductions arising therefrom. *State v. Sistrunk,* 98 Idaho 629, 570 P.2d 866 (1977); *State v. Gilbert,* 65 Idaho 210, 142 P.2d 584 (1943).

The victim testified that the appellant had been wearing "checkered pants with tan color," but the arresting officer testified the pants the appellant was wearing were blue and blue pants were admitted into evidence. The prosecutor's comment concerning the color-blindness of the victim could have been inferred from this evidence and we do not agree with the appellant that this statement was calculated to inflame the minds of the jurors and arouse prejudice or passion against the accused. We do not believe that the comment was so inherently prejudicial that an objection, accompanied by an instruction by the court to disregard the comment, would not have cured the defect.

The comment concerning the virginity of the victim requires more consideration. Assuming without deciding that the comment concerning her virginity was error and was prejudicial enough to warrant our review, we will proceed to consider the propriety of the remark. *See State v. Sharp,* 101 Idaho 498, 616 P.2d 1034 (1980).

Before *State v. LePage,* 102 Idaho 387, 630 P.2d 674 (1981), in order to warrant a reversal on appeal, the misconduct must have been shown to have materially contributed to the verdict of the jury. *State v. Smoot,* 99 Idaho 855, 590 P.2d 1001 (1978); *State v. Spencer,* 74 Idaho 173, 258 P.2d 1147 (1953). However, this Court in *LePage,* stated that the question to be posed where evidence has been improperly admitted is: "Is the appellate court convinced beyond a reasonable doubt that the same result would have been reached had the evidence been properly excluded?" 102 Idaho at 396, 630 P.2d at 683. Even though the prosecutor's comment is not considered "evidence" it can be analyzed under *LePage. See LePage,* 102 Idaho 396 n. 9, 630 P.2d at 683 n. 9. This test requires exclusion of the prejudicial comment and examination of the admissible evidence.

Carol testified that the appellant came home with Rowena St. Mark. She stated that the appellant then walked her home and shortly after arriving home she crawled out of her bedroom window and returned to Rowena St. Mark's apartment. She further testified, as did Rowena St. Mark, that she and the appellant left together in Rowena St. Mark's car. A witness, Julie Kenyon, stated that they arrived at the home of the appellant's friend.

Carol testified that after they left the appellant drove a short distance from the trailer, pulled off the road and raped her. The victim testified that the appellant then took her home. She told her parents what had happened and was taken to the hospital.

Doctor James R. Arthurs, who examined Carol at the Kootenai Memorial Hospital, testified that on that day she had a normal appearing hymen with a small tear. He stated that the tear was fresh and it had happened within the last twenty-four hours.

The criminalist examined the sex crime kit that was taken while Carol was at the hospital and testified that sperm heads had been found on the victim's underpants and sperm were found in large numbers from the vaginal smear. The criminalist also testified that she had analyzed pubic hair and head hair taken from the victim's underpants and bra and compared these with pubic and head hairs taken from the appellant. She stated that,

"In the debris collection envelope there were five hairs. And I found that two of them were microscopically similar in appearance to the sample from the victim's pubic hair, the known hairs from the pubic area. There were two hairs which were similar in appearance to the victim's head hairs. And there was one hair that was similar in appearance to the suspect's pubic hairs."

Even if the prosecutor's statement had been properly excluded from the trial, we are convinced beyond a reasonable doubt that the jury would still have arrived at the same verdict. Therefore, we hold it amounted to harmless error.

■ The appellant next contends that the introduction into evidence of the victim's underpants was error. The appellant argues that there were significant gaps in the chain of custody because the record did not show who removed the underpants from the girl and what was done with them prior to their being turned over to the mother at the hospital. Furthermore, the mother did not testify concerning what was done with the underpants during the time that they were in her possession.

"As a general rule in criminal proceedings, an exhibit must be shown to be in substantially the same condition when offered into evidence as it was when the crime was committed. However, the party offering the exhibit need not exclude all possibility of tampering. Where the Court is satisfied that in all reasonable probability the article has not been changed in any material respect, the article is admissible into evidence." *State v. Crook,* 98 Idaho 383, 384, 565 P.2d 576, 577, (1977) (citation omitted).

In the present case, Officer Charles Angle testified that he transported Carol and her mother to West Shoshone Hospital early in the morning of October 23, 1978. While there, he observed a nurse bring a pair of underpants out of the emergency room where Carol was being examined and hand them to Carol's mother. He observed the mother put the underpants in her coat pocket. He then transported Carol and her mother to Kootenai Memorial Hospital and while there he saw Carol's mother take the underpants out of her pocket and hand them to the nurse.

From this evidence we are satisfied that in all reasonable probability the underpants were not changed in any material respect. Therefore, we hold no error occurred in admitting the underpants into evidence.

■ The defendant also attacks the admissibility of the hair samples obtained by Nurse LaShaw from the bra and underpants of Carol. Firstly, the defendant objects that the hairs taken from the bra were mixed with the hairs taken from the underpants. Secondly, he objects to their admission because Nurse LaShaw testified that she put four hairs into the envelope while the criminalist testified that she analyzed five hairs from the envelope.

Concerning the first objection, it is immaterial whether they were located in the victim's bra or underpants. Their presence in either place is equally indicative of the defendant's involvement with her.

The second objection regarding the conflicting testimony as to the number of hairs is also unpersuasive. While the defendant argues that the fifth hair could have gotten "mixed in," that suggestion was not supported by the evidence. Nurse LaShaw testified to having sealed the envelope containing four hairs. The criminalist testified that these items were sealed when she received them. The criminalist also testified that when she opened the envelope five hairs were found in it. Considering the fragile nature of the hairs, it was entirely possible that one could have broken into two pieces. We are satisfied that in all reasonable probability the article was not changed in any material respect. *State v. Crook,* 98 Idaho 383, 565 P.2d 576 (1977); *State v. Griffith,* 94 Idaho 76, 481 P.2d 34 (1971).

 The appellant finally contends that the trial court abused its discretion in sentencing the appellant to an indeterminate period of eight years. I.C. § 18–6104 sets the minimum punishment for conviction of rape as imprisonment in the state penitentiary for not less than one year, and the maximum as imprisonment for life, at the court's discretion. "Where a sentence is imposed within the statutory limits an appellant has the burden of showing a clear abuse of discretion on the part of the court which imposed the sentence." *Idaho v. Kohoutek,* 101 Idaho 698, 699, 619 P.2d 1151, 1152 (1980) (citations omitted).

The record shows that the trial judge held a lengthy sentencing hearing and considered both probation and a 120-day rider. However, in light of the defendant's past record, the judge found neither of these alternatives to be desirable and determined that an eight-year sentence would be adequate under the circumstances.

In making this determination the trial judge considered the following: in 1971 the defendant had received a three-year deferred sentence for possession of dangerous drugs; in 1976 he had been committed to federal authorities for almost two years; and in 1978 he had been charged with aggravated assault, robbery and grand auto

theft. The judge also considered a letter from the Brule County Sheriff's Office which stated that the appellant had a history of assault but no record of convictions. The judge further stated that he had to keep in mind that the appellant was a twenty-seven-year-old man and that the jury had found that he had intercourse with a fourteen-year-old girl. Concerning this the judge said, "That's a much different situation than a 19 year old man having intercourse with a 17 and a half year old girl. And in those situations I think that the court does take a different view."

The appellant's background as shown in the presentence report was such that the sentence imposed did not constitute an abuse of discretion and there are no "compelling circumstances" as found in *State v. Dunnagan,* 101 Idaho 125, 609 P.2d 657 (1980), to justify a finding of abuse. In *Dunnagan,* the Court found that, "to impose a sentence which was more than double the length of their current natural lives was excessive and unduly harsh." 101 Idaho at 126, 609 P.2d at 658.

In this case the sentence was for eight years and the appellant was given credit for time spent in jail prior to the trial. The judge noted that he would be eligible for parole in about three years. Furthermore, unless reversed on appeal, the appellant had already been sentenced to three years in the federal penitentiary and the judge stated that there was very little question in his mind that the federal court "would probably give consideration and credit to some extent at least to any time you may spend under this sentence." Therefore, our review of the record convinces us that there are no compelling circumstances and the trial court did not abuse its sentencing discretion.

The conviction and the sentence are affirmed.

BAKES, C.J., McFADDEN, J., and SCOGGIN, J., Pro Tem, concur.

(McFADDEN, J., (Ret.), registered his vote prior to his retirement on August 31, 1982.)

BISTLINE, Justice, concurring only in part, and dissenting.

Short months ago this Court had before it another statutory rape case, *State v. Dennard*, 102 Idaho 824, 642 P.2d 61 (1982), wherein we upheld the trial court's dismissal which was entered after the jury returned a verdict of guilty. We noted there a confrontation between the prosecutor's discretion in prosecuting and a district court's discretion to dismiss in the interests of justice. The jury there in returning its verdict declared to the court its view that extenuating circumstances were present that should be considered in administering the law that were beyond its power to apply. The district court agreed and, having the power that a jury does not possess, exercised it by dismissing. By denying the State a right of appeal we did not interfere with the trial court's exercise of the broad power vested in it by the people.

That case, however, is not this case, and I would venture that Judge Towles might very well have responded in the *Dennard* case as did Judge Newhouse, and similarly I surmise that Judge Newhouse would have entertained the same views as did Judge Towles in the case at hand, which is not at all the same regarding the ages and circumstances of those involved. *Dennard* involved a female, "though under 18 years of age, [who] nevertheless had the attributes and appearance of a 25 year old." *Dennard*, 102 Idaho at 824, 642 P.2d at 61. Whereas here, we have a precocious youngster, but who is only 14 years old, taken advantage of by a 27 year old man—so the jury found.

Judge Towles made the observation, one with which I most emphatically agree, "[t]hat's a much different situation than a 19 year old man having intercourse with a 17 and a half year old girl. And in those situations I think the Court does take a different view." As pointed out, in the different situation in *Dennard* a different view was taken.

The transcript of the sentencing hearing shows that Judge Towles made an extremely conscientious review of the defendant's record. The sentence imposed in my view was not excessive, although a sentence of five years or six years might have served the defendant as well for the beneficial purposes which the court had in mind. Accordingly, I do not see any improper exercise of the trial court's sentencing discretion.

II.

Not so with regard to the exercise of prosecutorial discretion, which appears to have been in a high state of fluctuation. Defendant was arrested on October 23, 1978, on a charge of forcible rape, and the public defender was appointed as defendant's counsel on the same day. The preliminary hearing was delayed for one month, until November 22, 1978, and defendant bound over to district court to answer. The information was filed on November 24, charging defendant simply with: Rape, Section 18–6101, Idaho Code, a felony, but correctly reciting that *the preliminary hearing had been held on the charge of forcible rape.* Copies of the preliminary hearing were requested by both parties and the reporter allowed until January 1 to prepare the same. The case was set for trial to begin March 5.

The trial would commence as scheduled, but meanwhile appointed defense counsel was extremely and commendably diligent in the defense of his client. On the 21st of February, the trial court granted defense counsel's motion to suppress a taped interview, which presumably expelled some wind out of the State's evidentiary sails. The prosecutor was equally diligent, and both parties made extensive use of discovery processes. In short, from the initial filing of the charge of forcible rape, the State of Idaho expended a considerable amount of time and money for the services rendered in this case by a public defender and by a prosecuting attorney—to say nothing of the time and effort put in by the district judge, the magistrate, the transcriber of the preliminary hearing, the court reporter, and various other court attaches and personnel who may have been involved.

Such being the situation, and with the case set for trial on March 5, 1979, the prosecuting attorney on the 28th day of February, 1979, filed in the action a notice that on March 2, a Friday, being the Friday prior to the Monday on which would commence the trial, that he, the prosecutor, would then file a motion to amend the information.

The motion, filed on the 2nd day of March, was simply worded:

"COMES NOW, JOHN J. ROSE, JR., Deputy Prosecuting Attorney in and for the County of Shoshone, State of Idaho and moves the above-entitled Court for an Order authorizing the filing of an Amended Information in this matter charging the crime of Rape, Section 18–6101 Idaho Code, a felony. This Motion is made to more particularly describe the facts and to put defendant on notice."

A hearing was held on the 2nd day of March, although the record does not disclose any order shortening the ordinary time requirement, to which procedure defense counsel did not object.

Defense counsel, however, did object to allowing the filing of the amended information. The issue was thoroughly discussed, and because I am convinced that the prosecuting attorney abused the judicial discretion vested in him, and led the court into an erroneous ruling which deprived the defendant of an inalienable constitutional right, and being hopeful that, even should this Court persist in ignoring the importance of a transgression of such magnitude, other prosecuting attorneys in later criminal cases will voluntarily afford the defendants those rights which the Constitution declares belong to everyone accused of an offense, I deem it appropriate to set out in full the full text of the hearing:

"THE COURT: This is in the matter of State of Idaho vs. Ernest Gene LaMere, 12613.

Let the record show Mr. LaMere is present with his attorney Mr. Watson and the Prosecutor is present.

I believe this is a Motion to Amend the Information?

MR. ROSE: Yes, your Honor.

THE COURT: Has the defendant had a chance to go over the Amended Information?

MR. WATSON: Yes, your Honor. We have discussed it briefly yesterday afternoon, and he's again read it this morning in court.

THE COURT: Do you have any objection?

MR. WATSON: Yes, your Honor. We would have several objections to the amendment of the Information.

The way I read Rule 7(d) [1] of the Idaho Criminal Rules and Section 19–1420 [2] of the Idaho Code, the Court is permitted discretion to deny a proposed amendment of the Information.

It may allow the amendment of the Information *if it makes a finding that no additional or different offense* is charged, and additionally, substantial rights of the defendant are not prejudiced.

Basically what the amendment of this Information would do would interject the new issue of Statutory Rape alleging that the female involved was under the age of 18 years.

1. Rule 7(d) [now 7(e)] provided as follows: "Amendment [of] information or indictment. The court may permit a complaint, an information or indictment to be amended at any time before the prosecution rests if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced."

2. I.C. § 19–1420, was enacted in 1929 (1929 Idaho Sess. Laws ch. 72, p. 110) as an amendment to C.S. § 8835, now I.C. § 19–1419. Section 19–1420 provides:

"Amendment of indictment.—An indictment or information may be amended by the prosecuting attorney without leave of the court, at any time before the defendant pleads, and at any time thereafter, in the discretion of the court, where it can be done without prejudice to the substantial rights of the defendant. An information or indictment cannot be amended so as to charge an offense other than that for which the defendant has been held to answer."

We contend, your Honor, that this interjection of a third issue would make the Information inherently self-contradictory.

There are several subsections to the rape definition, the first one being the female under the age of 18. The third one is where the female resists, but her resistance is overcome by force or violence. And the fourth one is where the female is prevented from resistance by threats of immediate and bodily harm.

Basically the way the Information reads now, it's contradictory in that it alleges that the act was committed by forceably procuring her consent by violence. And then it goes on and says at the same time she was prevented from resistance by threats, and thirdly saying she had no capacity to resist or consent at all.

We feel that this type of shotgun approach to the criminal charge would simply confuse the jury. It would be prejudicial to the defendant also. And finally on this particular matter it could be contended that the allegations of violence and threat and whatnot were interposed in this whole thing simply to make relevant statements by the victim showing violence and whatnot, that this would be severely prejudicial to the defendant.

Another indication of prejudice shown to the defendant would be that this new issue is interjected into the case just one working day before the trial starts on Monday. This information was in the Prosecutor's possession at the time, apparently, that the original Complaint was issued. It was not interposed in the original Complaint; and yet the State waits until the last day before trial to amend that Information.

On a constitutional basis I was able to find a case out of the United States Court of Appeals in the 1st Circuit, *Meloon vs. Helgemoe,* written at 564 F.2d [602]. It's a 1977 opinion. And basically what this case deals with is a Statutory Rape statute which is virtually identical to that in Idaho. And this case states that such a statute is unconstitutional because it is not gender neutral; in other words, punishing a male for having sex with a female under the age of 18, but there is no consequent punishment of a female for having intercourse with a male under the age of 18.

I think the Court should take that into consideration in refusing to allow the Prosecutor to amend his Information to interject the Statutory Rape amendment.

THE COURT: Mr. Rose?

MR. ROSE: *I do apologize* for the time frame in which the Motion was brought. However, we are making this Motion to very particularly inform the defendant the crime for which he is charged.

Regarding the Idaho Criminal Rules, I call the Court's attention to 7(d) where it deals with Indictment and Information.

'It may be alleged in a single count that the means which the defendant committed the offense are unknown, or he committed it by one or more specific means.'

I also call the Court's attention to the recent case of *State vs. Gumm,* [99 Idaho 549, 585 P.2d 959] in Idaho Capital—25 ICR, 899. That was a case where there was a trial, and the Prosecutor at the close of his evidence moved to amend the Information to more specifically allege the property that was stolen in that case. As it stood, the Information was definitely defective. The court said that it should be allowed because it didn't affect his substantial rights due to the fact that from the preliminary hearing on the defendant was informed of the exact things that were taken in that case.

And if the amendment took the defendant by such surprise that he was unable to proceed for trial, he should be asking for a continuance.

Now, with a little bit regarding the facts in this case, the defendant—the Court heard his statement last time, as the initial booking statement indicated, I believe was indicated, he said the victim was just a kid. *In the transcript of the preliminary hearing one of the first questions I asked of Carol was her age where she stated it was 14.*

There's been—There were preliminary negotiations between defense and prosecution regarding the plea of Statutory Rape.

However, those weren't able to be consummated in those negotiations. So, the defendant's been aware of this all along, and no prejudice is created we submit. We are allowed to do that according to the Rules I believe.

THE COURT: The first thing that bothers me is, aside from the question of surprise, would be whether or not the Motion was granted, I would have to remand it to the Magistrate Court for preliminary hearing. Have you considered that?

MR. ROSE: Yes, your Honor. And due to 7(d), enforcing—Well, let's turn first to—19–1420 probably takes care of the question. It says you can't charge an offense other than for which the defendant has been held to answer.

The facts regarding what would constitute a Statutory Rape were dealt with at the preliminary hearing. And, as the Rule says, we don't have to charge the subsections also of 18—or the Rape statute.

Both the Complaint and the original Information allege that he was charged with Section 18–6101 and did not specifically assign the subsections under it for which he was charged.

THE COURT: Where do you find that now?

MR. ROSE: In the Complaint, the original Complaint that was filed, criminal, Rape, Section 18–6101, a felony. And within that the charge is Statutory Rape. He was aware of it.

And getting back to the original purpose of this Motion, it's just to particularly describe the facts, or sufficient facts about the crime in the Information.

THE COURT: Well, *the original Complaint charges the crime of Forceable Rape.*

Now, if the Amended Information was allowed, we've got not only Forceable Rape but Statutory Rape.

MR. ROSE: I think it would be a lesser included in any event.

THE COURT: Lesser included?

MR. ROSE: Forceable Rape.

MR. WATSON: I would take contention with that. It's a totally different type of offense.

MR. ROSE: You certainly have Forceable Rape on a person even though she is below 18 years old. The fact she is 14 years old is highly relevant in this case.

THE COURT: It carries the same penalty for any of the acts of rape. *I don't see how it could be considered a lesser included offense.*

Well, that's what disturbs me is this problem of—I've always considered in my own mind the offense of Statutory Rape, of course, only required proof of penetration or intercourse and proof of age. For the Forceable Rape it not only required the proof of penetration but also proof of lack of actual consent, which are two different things. It seems to me—

I would like to do some more looking into this thing before I make any determination of that matter. And I would think that it probably would not necessarily be the question of surprise as much as *the question of whether or not the defendant has already been bound over on one charge and is now being expected to answer another one at the time of the trial.* I wouldn't feel very comfortable at this point without really doing some research on it.

I am aware of that constitutional problem, but I really don't think that at this point it would be very pertinent. I think the question you raised would be as appropriate to a Forceable Rape as it would be to a Statutory Rape charge.

It's true he was bound over on the charge of Rape under 18–6101, a felony.

MR. ROSE: In the preliminary hearing, your Honor, if I may, would not be one word different.

THE COURT: I appreciate that. *But your original Complaint charges Forceable Rape, and that's what the preliminary hearing was held on.*

Well, I'm not going to make a ruling off the bench on this one. I want to take a look and see if I can find anything that would help.

MR. WATSON: If I might, the Prosecutor did mention something about the appropriate remedy as a continuance in this matter.

The Court is aware there is a $25,000 bond set. Mr. LaMere cannot raise that. We have an expedited trial setting on this; so I think that Mr. Rose's proposed remedy of a continuance is ridiculous under the particular situation.

MR. ROSE: Your Honor, may I—I think it's ridiculous that he asserts that. He has been aware of this information from day one. Additional time for trial preparation is really nil.

The victim testifies to her age and—testified as to her age, which is really the only question that would be, in effect, different.

THE COURT: Well, that may well be. But I would want to get over the first hurdle before I get to the next one.

If it appeared it would not necessitate a remand to the lower court, then I would have to consider whether or not it would be such a surprise as would be inequitable to raise it at this point.

I would think off-hand if it would require a remand, that I would have to deny it.

Have either one of you done any research on that point as to whether it would require a remand?

MR. WATSON: I don't believe I have, your Honor.

THE COURT: Well, I'll see what I can find on it, and I will let you know as quickly as I can.

Any other matter in this case.

MR. ROSE: No." (Emphasis added.)

The initial reaction of Judge Towles to this belated proposed amendment was exactly what was expected to be found on going to the transcript. Moreover, it is the same reaction which would have emanated from most if not all of Idaho's experienced trial judges. Judge Towles initially saw that statutory rape was not a lesser included offense, and that the amendment could not be allowed unless the case was first sent back to the magistrate court for a preliminary hearing. The Idaho Constitution allows the trial of any person on a prosecutor's information only "after a commitment by a magistrate . . . ." Id. Const. art. 1, § 8. Here there had been no preliminary hearing on the charge of statutory rape. And, if the Constitution was not authority enough, the legislature, which is the voice of the people, has also ruled in I.C. § 19–1420 that "[a]n information or indictment cannot be amended so as to charge an offense other than that for which the defendant has been held to answer." Neither the legislature nor the Framers of the Constitution were willing to concede that mere expediency should prevail as against the constitutional and statutory provisions. Even the Court's own rule, I.C.R. 7(e) (formerly I.C.R. 7(d)), does not purport to alter the substance of the Constitution or the statutory enactment.

Section 19–1420 and the constitutional provision absolutely prohibit any amendments to an information which add a charge of an offense other than that for which the defendant has been held to answer. But that is not all. Other key language of the statutory protection is that a permissible amendment can be allowed only "where it can be done without prejudice to the substantial rights of the defendant." Bearing in mind that I.C. § 19–1420 was originally enacted as an amendment to I.C. § 19–1419, it is important in considering "prejudice" that the latter, § 19–1419, speaks in terms of allowing only that "which does not *tend* to the prejudice of a substantial right of the defendant upon its [the trial, judgment or proceedings] merits." (Emphasis added.) An outright demonstration of prejudice is not required. Anything which logically appears as prejudicing or tending to prejudice the substantial rights of a defendant should not be allowed. Being faced with an additional charge is prima facie prejudicial.

Any candid evaluation of the hearing at which the prosecutor sought to amend and charge the defendant with statutory rape has to begin with the state's delay in making the request until one working day before trial—an absolutely inexcusable state

of affairs on any reasoned view of the situation. First of all, the total showing of diligence was what? An apology! Sorry, for almost five months of inaction during all of which time, or at least from the 22nd day of November, the date of the preliminary hearing, at which time the prosecutor as well as defense counsel became advised (if they didn't already know) that the girl involved was only 14 years old. Having tendered an apology as the equivalent of a requisite showing of due diligence or inadvertence, the prosecutor then sought to justify his unexcused delay by implying that his proposed amended information would "very particularly inform the defendant the crime for which he is charged." The defense, however, had not moved for more specificity as might have been done under I.C.R. 12(b)(2), and, as pointed out, there had been extensive discovery on the charge of forcible rape, and a suppression motion had been successful. This case was ready for trial, and defendant had been incarcerated for going on five months.

It is seen in reading the above transcript of the hearing that the prosecutor was leading the trial court into the theory that there is no distinction between statutory rape and forcible rape, or if there is, it is of little matter so long as a defendant is charged with rape of some kind, and the statute, I.C. § 18–6101 is given mention. The trial court initially saw through this, stating as he did that "the defendant has already been bound over on one charge and is now being expected to answer another one at the time of trial."

The court concluded, however, later that same day, the Friday before trial would commence on Monday, to allow the amendment—doing so by a written order filed late that same day—the 2nd of March:

"On February 28th, 1979, the State moved to amend its Information on the above entitled action to add to the Information the fact that the complaining witness, or victim of the crime, was under the age of consent. The Information had previously charged the crime of rape by force and fear.

"Idaho Code Section 18–6101 defines the crime of rape in various subsections, one of which is intercourse with a girl under the age of eighteen, and another of which is intercourse by force and violence or fear.

"Said motion was heard on March the 2nd, 1979, and the trial date is March the 5th, 1979.

"In the California case of *People vs. Blankenship,* [103 Cal.App.2d 60] 228 P.2d 835, the California court when faced with a somewhat similar situation held

" 'Regardless of the subsection referred to in the information, if the evidence brings the case within any of the subsections of section 261, the offense of rape has been proved by the prosecution.'

"In *Blankenship* the California court further held that defendant's due process rights were not violated in that but one punishable offense of rape resulted from the single alleged act of intercourse,

" '. . ., although that act may be accomplished under more than one of the conditions or circumstances specified in the foregoing subdivisions.'

"It is apparent that at the preliminary hearing the victim of the crime testified that she was fourteen years of age, hence, there could be no surprise to the defense of this element being injected into the case at this late date, *and the defendant was bound over to the District Court under the charge of rape without specifying the subsection of the statute.*

"Accordingly, the Court has determined that the motion to amend, even at this date, would not be unreasonable or prejudicial to the defendant.

"IT IS THEREFORE ORDERED, That the Amended Information may be filed and the defendant's plea of not guilty would stand to the Amended Information.

"IT IS FURTHER ORDERED, That the trial will proceed as scheduled, March 5th, 1979.

"DATED at Wallace, Idaho, this 2nd day of March, 1979." (Emphasis added.)

That the prosecutor had successfully misdirected the court at oral presentation is eminently clear from that passage of the foregoing Order relating that "the defendant was bound over to the District Court under the charge of rape without specifying the subsection of the statute." If this was an incorrect premise, it is then clear that the order allowing the amended information was improvidently entered, and would not have issued except for the unsound premise upon which it was bottomed. Was the underlying recited premise in error?

First of all, other than in indictment proceedings—with which we here have no concern—the basic requirement which initiates a felony criminal case in Idaho is the complaint. The complaint here alleged that the defendant

"did then and there wilfully, intentionally, unlawfully, feloniously and forcibly and by threats of great and immediate bodily harm, accompanied by the apparent power of execution, and against the consent of one [name omitted], accomplish an act of sexual intercourse with said female, who was not the wife of said defendant, and she, the said [name omitted], did then and there resist the accomplishment of said act of sexual intercourse, but her resistence was then and there overcome by force and violence used upon and against her by the said defendant."

The record shows, as the trial court observed, a preliminary hearing was held *on that charge,* and the defendant bound over to district court. The Information filed in district court is as follows:

"JOHN J. ROSE, JR., Deputy Prosecuting Attorney in and for the County of Shoshone, State of Idaho, who in the name and by the authority of said State prosecutes in its behalf, in proper person comes now into the above-entitled Court and gives the Court to understand and be informed that Ernest Gene LaMere is accused by this Information of the crime of Rape, Section 18–6101, Idaho Code, a felony, upon which charge the said Ernest Gene LaMere having been duly brought before a Magistrate, to-wit: Honorable Don Gumaer, Magistrate of the above-entitled Court, on the 22nd day of November, 1978, and having had his preliminary hearing therein upon said charge, was by said Magistrate thereupon held to answer to the District Court of the First Judicial District of the State of Idaho, in and for the County of Shoshone, to said charge, which said crime was committed as follows, to-wit:

That Ernest Gene LaMere on or about the 23rd day of October, 1978, in the County of Shoshone and State of Idaho, then and there being, did then and there wilfully, intentionally, unlawfully, feloniously, and forcibly and by threats of great and immediate bodily harm, accompanied by the apparent power of execution, and against the consent of one [name omitted], accomplish an act of sexual intercourse with said female, who was not the wife of said defendant, and she, the said [name omitted], did then and there resist the accomplishment of said act of sexual intercourse, but her resistence was then and there overcome by force and violence used upon and against her by the said defendant.

"All of which is contrary to the form, force and effect of the statute in such case, made and provided, and against the peace and dignity of the people of the State of Idaho."

It is true that the Information did not by number refer to the subsection of I.C. § 18–6101 which criminalized the conduct in question, but that is totally inconsequential in view of the statute's opening statement that there are, in the disjunctive, "either" of the following enumerated circumstances which will amount to rape, and there are six (6) such factual situations set forth—all criminalized as constituting rape. The first is intercourse with a female under eighteen years of age—a circumstance which is criminalized as rape, a circumstance with which defendant was never charged in the initial complaint, a charge on which he was never given a preliminary hearing, nor bound over on to district court,

and yet the one on which he was convicted under an information filed against him less than one working day before he was scheduled to go to trial on a charge of forcible rape, of which he was acquitted.

It is inescapable that the Information, irrespective of whether it gave mention by number to the subsection allegedly constituting the crime of rape, as was the complaint, was based on the following two paragraphs of the statute:

"Where she resists, but her resistance is overcome by force or violence.

"Where she is prevented from resistance by threats of immediate and great bodily harm, accompanied by apparent power of execution; . . . ."

The Information alleging the specific criminal acts of which defendant was allegedly guilty reads that intercourse was accomplished "forcibly and by threats of great and and immediate bodily harm, accompanied by the apparent power of execution, and against the consent . . . [of the girl whose] resistance was then and there overcome by force and violence used upon and against her by the said defendant." The provisions of the rape statute under which the defendant was charged by the complaint, held to answer following a preliminary hearing, and then charged by the Information and acquitted by the jury was established by irrefutable documentation. For certain he was not complained of, or given a preliminary hearing on, or held to answer on any of the other four circumstances of rape, which are:

"Where the female is under the age of eighteen (18) years.

"Where she is incapable, through lunacy or any other unsoundness of mind, whether temporary or permanent, of giving legal consent.

. . . .

"Where she is at the time unconscious of the nature of the act, and this is known to the accused.

"Where she submits under the belief that the person committing the act is her husband, and the belief is induced by artifiçe, pretense or concealment prac-

ticed by the accused, with intent to induce such belief." I.C. § 18–6101.

In this appellate court business of Monday morning quarterbacking, there is, in my own efforts, often room for doubt. In this case, however, I am without any doubt that had Judge Towles not had this motion dropped on him at the last hour, he would not have granted it. Everything he pointed to at the time of oral presentation of the prosecutor's motion showed an awareness of the reasons for not granting a motion—other than that he did not question the prosecutor's lack of reasons or excuses for his dilatory tactics in not having prosecuted the defendant for statutory rape from the beginning—a discretionary decision made by the prosecutor and only reneged when he failed to prevail on an important suppression motion and failed to persuade the defendant to plead guilty to statutory rape (with which defendant was not charged).

Had the prosecutor, in view of the loss of the evidence consisting of the interrogative testimony and the taped interview, determined that he could not expect to make out a case of forcible rape, one of his options was to ask for a dismissal of the forcible rape charge, and at the same time seek leave to "amend" the information so as to charge only statutory rape. The beauty of pondering upon that unique circumstance is the readily drawn conclusion that under Idaho's longstanding statutes and rules of criminal practice, it simply cannot be done—which to my mind readily demonstrates that if the prosecutor could not in midstream substitute statutory rape for forcible rape, then a *fortiori* he could not add on the statutory rape charge at that late date.

Without what I think to be a proper regard for the shortness of time in which Judge Towles had to rule one way or the other, the Court accepts *People v. Collins,* 54 Cal.2d 57, 4 Cal.Rptr. 158, 351 P.2d 326 (1960), for the proposition that the allowing of the late amendment can be sustained. *Collins,* however, came up on appeal in a different context. It did *not* involve a motion to file an amended information made

one working day before trial. The defendants there went to trial on accusations "of rape commited with force and violence," but were convicted only of statutory rape—clearly what is understood to be a variance. In upholding the conviction, the California court observed that "the attorney for one of the defendants then expressed the view that the evidence tended to show statutory rape only." *Collins,* 4 Cal.Rptr. at 160, 351 P.2d at 328. The opinion is extremely terse, and all that comes out of it for certain is that counsel for the defendants not only failed to object to evidence amounting to a variance, but went so far as *to invite a conviction of statutory rape* as a result preferable to a conviction for forcible rape.

The real significance of the *Collins* case, and obviously the reason for the California Supreme Court granting a hearing following the decision of the District Court of Appeal, Second District, Division 1, at 345 P.2d 484 (Cal.App.1959), was to clear up a prior series of cases which had long been extremely poor precedential law in California, and upon which the lower court had relied. Hence, the supreme court on affirming (which would have gained my vote) used the occasion to specifically overrule *People v. Snyder,* 75 Cal. 323, 17 P. 208 (1888), and to disavow insofar as they are inconsistent with its opinion in *Collins'* a long, long string of cases:

> "The case of *People v. Snyder,* 75 Cal. 323, 17 P. 208, which holds that under an information charging rape accomplished by force any of the matters mentioned in section 261 may be proved without regard

to whether the defendant has had notice required by due process, is overruled. The following cases, which contain language or adopt reasoning similar to that in *People v. Snyder,* supra, are disapproved insofar as the language or holdings are contrary to the views expressed herein: *People v. Jailles,* 146 Cal. 301, 304, 79 P. 965; *People v. Vann,* 129 Cal. 118, 121, 61 P. 776; *People v. Tollack,* 105 Cal.App.2d 169, 172, 233 P.2d 121; *People v. Blankenship,*[3] 103 Cal.App.2d 60, 66, 228 P.2d 835; *People v. Cassandras,* 83 Cal.App.2d 272, 276, 188 P.2d 546; *People v. Mummert,* 57 Cal.App.2d 849, 857, 135 P.2d 665." 4 Cal.Rptr. at 160, 351 P.2d at 328 (emphasis added).

*Snyder,* an 1888 case, is an abomination, so outrageous in fact that anyone reading it will wonder how the California courts could continue to adhere to it for almost three-quarters of a century. Be that as it may, in 1960 *Snyder* and all of its sickly progeny were struck down. The court's rather terse holding in *Snyder* was that, in reviewing a statute which is nearly identical to ours, "[w]e think the true construction of section 261 to be that thereby the legislature meant merely to put beyond doubt the rule that on an information for rape the things mentioned in the subdivisions could be proven, and would establish the crime." 17 P. at 209. Such an incredible holding has never been made by an Idaho court, and could not be in view of our criminal practice statutes which largely date back to 1864, and have governed the requirements of criminal pleadings.

**3.** It will be noted that *Blankenship* was the one case upon which Judge Towles placed his reliance in going against the curb-stone conclusions which he expressed at the hearing on the motion for leave to amend. It will also be noted that the prosecutor dropped this motion on Judge Towles at the last minute without presenting any supporting brief of points and authorities. Given no citation of case law and no appreciable time in which to do any research of his own, it is no wonder that the one case which Judge Towles did find was no longer valid authority. As I have mentioned on other occasions, borrowing the language from the Ninth Circuit Court of Appeals, "[w]e at the appeal level, in our somewhat cloistered

atmosphere, have a substantially better opportunity to study and analyze a problem such as here presented." *Roberts v. Hollandsworth,* 582 F.2d 496, 500 (9th Cir.1978). The "substantially better opportunity" available to appellate judges is primarily the element of time. In preparing this opinion which I have worked on off and on for some months it would be safe to say that the time available to me is at the least one hundredfold that which Judge Towles had in which to rule. To my mind, the lateness of the motion standing alone was sufficient grounds to have justified an outright refusal to allow the amendment—let alone the failure to present any excuse; only an apology.

In one of *Snyder's* progeny which was only disapproved, the California Supreme Court, again through Chief Justice Gibson (who also authored *Collins*) did take note that "only one punishable offense of rape results from a single act of intercourse, *though it may be chargeable in separate counts* when accomplished under the varying circumstances specified in the subdivisions of section 261 of the Penal Code." *People v. Craig,* 17 Cal.2d 453, 110 P.2d 403, 405 (1941) (emphasis added). This itself was a drastic departure from the infamous *Snyder* case of 1888, and for lawyers and lower courts should have signalled *Snyder's* implicit demise. But the signal was too weak. When the intermediate appellate court in its *Collins* opinions, notwithstanding the *Craig* case, relied upon *Snyder* and its ill-begotten progeny, the supreme court had to step in as mentioned earlier. The true holding in *Collins* was in accord with the *Craig* holding and requires that "an accused should be advised of the charge against him in order that he may have a reasonable opportunity to prepare and present his defense." *Collins,* 4 Cal.Rptr. at 160, 351 P.2d at 328, and is "chargeable in separate counts when accomplished under the varying circumstances specified in the subdivision of section 261 of the Penal Code." *Craig,* 110 P.2d at 405.

Yet, under California's *Snyder* doctrine, the prosecutor could, without either dismissing the forcible rape charge or without adding on the statutory charge, go to trial and present evidence which might establish rape in any one of the six different statutory circumstances. Fortunately, that cannot be done in California since *Snyder* was overruled. Fortunately, in California, since *Craig* and then *Collins,* it is necessary that the defendant be charged by count pleading with whatever types of rape the defendant is alleged to have committed—requiring initially a complaint so doing, a preliminary hearing on those counts, an order binding over on those counts, and then a proper information charging the counts sustained by the evidence presented at the preliminary hearing. In this respect California's procedure since *Collins* and *Craig* is in keeping with that which has always obtained in Idaho.

As I have indicated, most practicing attorneys will see little problem with the narrow holding of the *Collins* case on its particular set of circumstances. Defense counsel in that case apparently did not understand the full import of *Craig,* and accordingly, failed to register proper objections, but, beyond that urged that the evidence showed their clients were guilty of statutory rape. Hence, the variance would not properly be grounds for assessing error on appeal. But that is not this case.

Here defense counsel did object, and in arguing his objections strongly made the point that it would prejudice his client to at that time be faced with a statutory rape charge—against which there is no defense other than that there was no intercourse, as was here the defense, and at the same time labor under the extreme disadvantage of evidence being introduced before the jury that defendant allegedly had used force and threats to overcome the minor girl involved. Defense counsel well knew what he was talking about, as most trial attorneys of experience will agree. The jury did find against the charge of forcible rape. It is not speculative to wonder after reading the record whether, absent interjection of evidence offered to prove elements of force and threats, the jury might not have found beyond a reasonable doubt that any intercourse took place between the minor girl and the defendant.

Firmly convinced that the law of California is now no different than the law in Idaho in the requirement that a defendant should not be made to go on trial unless he has been charged, accorded a preliminary hearing, and held to answer for the exact charge on which he is convicted,[4] I return to

---

4. If the *Collins* case, viewed in the proper light shed by its predecessors, could be read for the proposition announced today by the majority in this case, there was no need, as *Snyder* taught, to ask for an amendment to the information. Obviously even the prosecutor here recognized that. If *Snyder* and not *Collins* were to be the case law which Idaho courts should follow,

a consideration of the prosecutor's initial decision to *not* prosecute for statutory rape, and his later last-minute courthouse-step decision that he would—all of which was discussed rather persuasively by defense counsel at oral argument. Only in recent years has prosecutorial discretion vis-a-vis prosecutorial vindictiveness played a significant part in appellate court decisions. Although apparently not given consideration by the trial court, and for certain not given such in today's opinion by the Court, it is a factor which necessarily forces itself to the front in passing upon the propriety of the belated move to add a charge of statutory rape.

Defense counsel suggested, and I sincerely believe that most people would agree, there are a great number of statutory rapes taking place all over the country today, and even here in Idaho, which are not prosecuted. A fanatic prosecutor could work himself, and the judicial system, to death if the violators, all male under the statute, were searched out and pursued. As defense counsel points out in his brief:

"It is common knowledge in today's time of 'precocious' teenagers that young people are, more and more, experimenting with sex before reaching age eighteen as well as before marriage. While it is difficult to obtain accurate statistical information on the number of females under the age of eighteen engaging in sexual intercourse, there are other available indicia in the statistics which point out the scope of the trend.

"Recently, the House Select Committee on Population released its final report on fertility and contraception use among women in the United States. [See House Report No. 95–1842, 95th Congress, 2d Session, January 5, 1979. Also see *Science* Vol. 204, No. 4393, May 11, 1979 at p. 597.] The Report at pages 8–9 lists statistical findings relating to trends in adolescent fertility, among which are:

1. The birth rate of girls 10–14 increased by 33 percent between 1966 and 1976.

2. Of all of the young women who were 15 years of age in 1973, 40 percent became pregnant at least once before they reached their twentieth birthdays.

3. Pregnancy is the single most common reason that young girls drop out of school; nearly 70 percent of pregnant girls fail to complete high school.

4. In 1975, the Federal Government disbursed nearly half of the total AFDC expenditures to households including women who were teenagers when they first gave birth. This represented no less than $4.65 billion.

5. Sexual activity among unmarried female adolescents has greatly increased. This increase has been observed in every age group from 15–19 years of age.

6. About one million adolescent girls become pregnant each year; in 1976, approximately 570,000 of those pregnancies resulted in live births, and about 300,000 pregnancies resulted in induced abortions.

"Needless to say, each and every act of sexual intercourse does not result in a pregnancy. Thus, it can be safely said that a high number of adolescent pregnancies results from an even higher rate of adolescent sexual activity. And while such activity among teenagers remains high *only a handful of men stand accused or convicted of statutory rape.*" (Emphasis added.)

The State of California's brief in *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981), discloses that in that state they estimate "almost 50,000 pregnancies among 13–17-year-old girls during 1976," and that "an average of only 61 juvenile males and 352 adult males were arrested for statutory rape each year between 1975 and 1978." 101 S.Ct. at 1216 n. 8 to opinion of Justice Brennan. No mention is made as to how many prosecutions followed those arrests. It cannot be seriously contended but that

then it would seem that the prosecution was not obliged to amend his pleading so as to add

the charge of statutory rape. Such was the teaching of *Snyder.*

the prosecutor in this case, in an exercise of the broad discretion which our judicial system vests in prosecutors, initially decided to not file a charge of statutory rape even though he full well knew the girl's age. Over five months later, and on the eve of trying the charge of forcible rape, he experienced a change of mind. Why?

On the 21st day of February 1979, Judge Towles, in a four-page memorandum decision, suppressed an interrogation which took place soon after defendant had been arrested, and also suppressed a tape recording.[5] Seven short days later, and three working days before trial, the prosecutor responded to this adverse decision by giving notice of his intention to now add the charge of statutory rape. As shown in the text of the prosecutor's opening remarks in arguing to the trial court his motion for leave to amend, *ante*, p. 50, the prosecutor had been trying to obtain the defendant's plea to statutory rape, but was unsuccessful. Where it was only a week before trial that the motion seeking amendment was made, following immediately on the heels of Judge Towles' suppression ruling, it follows as does night follow day that that ruling precipitated the request for a guilty plea to statutory rape—which the prosecutor had initially determined against charging.

The defendant had a clear right to decline to enter a plea of guilty to the crime of statutory rape with which he had not been charged, and his counsel had a right—better said, duty—to challenge evidence obtained in violation of statutory or constitutional rights, or both.

The question squarely presented is, then, can a prosecutor who has determined to not prosecute a charge of statutory rape, there-after, and upon losing a suppression motion which is critical to his forcible rape case, and who cannot get the defendant to plead guilty to a charge of statutory rape, thereupon, and but one working day before trial on the forcible rape charge, add on a charge of statutory rape? The law which I read answers in the negative, that the prosecutor cannot do so without overcoming the presumption of vindictiveness which, like the Phoenix, arises from the smouldering ashes of the disintegrating case of forcible rape.

The answer to the posed question is found in *United States v. Gallegos-Curiel*, 681 F.2d 1164 (9th Cir.1982), where that court reviewed the development of the principle involved from its inception in *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), down through *United States v. Goodwin*, —— U.S. ——, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), and stated the rule thusly:

> "Vindictiveness is antithetical to a fair evaluation of the case. If an objective assessment of the prosecution's position reveals that charges should be increased or made more precise *to take account of information not previously known to the prosecutor* or to state more accurately the Government's position, then the prosecution has the right, if not the duty, to do so, *provided there is no procedural unfairness to the defendant ....*" 681 F.2d at 1169 (emphasis added).[6]

Here it cannot be nor is it contended that the age of the girl involved was "not previously known to the prosecutor." Nor can anyone seriously contend on this record that the prosecutor had not knowingly in an exercise of his prosecutorial discretion determined to not prosecute for statutory rape. Anyone who reads the record on

---

**5.** Not an issue in this case, but because it should be helpful to law enforcement officials, I append that memorandum decision in the hope that prosecutors will make it available to sheriffs and police chiefs for further dissemination down through the ranks.

**6.** Prosecutors and public defenders throughout the State will also do well to examine the content of *People v. Walker*, 84 Ill.2d 512, 50 Ill.Dec. 718, 419 N.E.2d 1167 (1981), where for prosecutorial vindictiveness a death penalty was set aside. "[T]he due process clause of the United States Constitution now requires rules which will prevent a vindictive prosecutor from punishing a defendant for doing something the law allows him to do." 50 Ill.Dec. at 726, 419 N.E.2d at 1175. *See also* another death penalty prosecutorial vindictiveness case, *Patterson v. Randall*, 637 S.W.2d 16 (Mo.1982).

appeal is bound to concede that the attorneys involved, the prosecutor and the public defender, are both able and thorough advocates, and extremely well-versed in the law. Where defense counsel argued, in resisting the prosecutor's motion for leave to amend, that statutes criminalizing statutory rape written as Idaho's are "unconstitutional because [they are] not gender neutral", citing *Meloon v. Helgemoe,* 564 F.2d 602 (1st Cir. 1977), *cert. denied* 436 U.S. 950, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978), it is not in the realm of conjecture to accept that the prosecutor was as equally versed in the law when he made his decision to not prosecute for statutory rape. It is to be noted that the prosecutor, in responding to the argument of defense counsel, did not counter defense counsel's contention that the statute is unconstitutional, nor did he challenge the validity of the *Meloon* case. It must also be kept in mind that at the time, October of 1978, the prosecutor determined to not press a charge of statutory rape under the Idaho statute, the *Meloon* case was *the* case which dealt with a rape statute framed in language which is, as defense counsel put it, almost identical to Idaho's.[7] The First Circuit Court in its opinion painstakingly critiqued and either distinguished or held inapplicable, 564 F.2d at 605 n. 4, those cases which the New Hampshire Supreme Court had relied upon for its statement—"Defendant cites no authority in support of his novel theory and we note that whenever we have found it advanced, it has been universally rejected"—rejecting *Meloon's* contention in that court that the New Hampshire statute "on its face and as applied to him denies him equal protection of the law as guaranteed by the fourteenth amendment to the United States Constitu-

tion." *State v. Meloon,* 116 N.H. 669, 366 A.2d 1176 (1976). The New Hampshire Supreme Court, as noted in the circuit court of appeals' opinion, simply adopted what it believed to be holdings of those cases (which the circuit court of appeals examined closely and rejected), and concluded that the New Hampshire statutory classification was reasonable and not constitutionally suspect.

Where the New Hampshire court ended its opinion with the statement that "[t]he potential pregnancy of the female and the remote contingency of the older female seducing the under-age male with harmful results justify the legislative restriction of the crime to the male sex," 366 A.2d at 1177, the First Circuit Court of Appeals wrote that "[t]here is no question that the New Hampshire statute here involves a classification based solely on gender," 564 F.2d at 605 n. 4, and "[w]e examine the pregnancy prevention rationale with special wariness." *Id.* at 607. Adding, that "[t]he pregnancy prevention rationale cannot withstand such scrutiny in this case." *Id.* at 608.

It seems clear that, other than for the lateness of the prosecutor's motion, had Judge Towles had ample opportunity to study the *Meloon* opinions, and there being *at that time* no case law to the contrary, he very well might have ruled against allowing the proposed amendment based upon the apparent unconstitutionality of the Idaho statute—as suggested by defense counsel.

At that time, early March of 1979, the case of *Michael M. v. Superior Court of Sonoma County,* 25 Cal.3d 340, 159 Cal.Rptr. 340, 601 P.2d 572 (1979), *aff'd* 450 U.S. 464,

---

7. Circumstances of rape as statutorily set by the Maine legislature and in effect at the time of *Meloon*'s conviction were as follows:

"632:1 Rape.
 "I. A male who has sexual intercourse with a female not his wife is guilty of a class A felony if
 "(a) he compels her to submit by force, or by threatening imminent force or serious bodily injury, or kidnapping to be inflicted on anyone; or

"(b) he has substantially impaired her power to appraise or control her conduct by administering without her knowledge a substance for purposes of preventing resistance; or
 "(c) the female is unconscious or less than fifteen years old; or
 "(d) he knows that she suffers from a mental abnormality which renders her incapable of appraising the nature of her conduct; or
 "(e) he knows she is unaware of the sexual nature of the act being committed upon her."

101 S.Ct. 1200, 67 L.Ed.2d 437 (1981), was still eight months short of its aborning. Even further down the road was *Michael M.*'s review by the United States Supreme Court. Such again is demonstrative of the problems which arise when a prosecutor some six months later decides to overrule his original decision to not present any charge for statutory rape. At this point, it is to be kept in mind that the validity of the Idaho statute is not addressed, and the point being made is that the state of the law on suspect gender based classification provided the prosecutor with sufficient grounds in addition to those which have been quoted from defendant's brief, for a valid discretionary decision to not prosecute a charge of statutory rape.

When the prosecutor brought his motion for leave to amend, the belatedness of his timing, and the tender of only an apology instead of any reasonable excuse, should have provoked the trial court to inquire as to the delay and to require that the prosecutor dispel the presumption of vindictiveness. At the least, the Court today should reverse on this issue alone, with directions that on remand the prosecutor be required to satisfactorily explain his extremely late decision to amend the information, and also overcome, if he can, what is at least a presumption of vindictiveness. For my own part, the record which we have before us sufficiently established prosecutorial vindictiveness as a matter of law. I do not see any way that the prosecutor can here get around the fact that he knew from the very beginning that the girl involved was only 14 years old. He cannot meet the *Gallegos-Curiel* requirement that he seeks to amend "to take account of information not previously known." Nor can he avoid the requirement that the "timing" be such that "there is no procedural unfairness to the defendant." *Gallegos-Curiel*, 681 F.2d at 1169. Back of it all must be kept in mind that the prosecutor was also insisting of defense counsel that he plead his client guilty of violating a criminal statute which defense counsel, based upon sound authority then *controlling* firmly believed unconstitutional. Could defense counsel ethically so advise his client? I think not.

### III.

While I do not see the California case of *Michael M.* as unsound as the *Snyder* case, I am far from persuaded that it should govern this Court's decision on the constitutionality issue. Conceding that the California statute "discriminates on the basis of sex because only females may be victims, and only males may violate the section," the California court then declares that "this obviously discriminatory classification scheme is readily justified by an important state interest." *Michael M.*, 159 Cal.Rptr. at 342, 601 P.2d at 574. The California court explains, apparently amazed at what it believes itself to have been the first discoverer, that there is "the immutable physiological fact that it is the female exclusively who can become pregnant." *Id.* 159 Cal.Rptr. at 342, 601 P.2d at 574. Mentioning the tragic cost of teenage pregnancies and their disastrous consequences, it then declares that "the Legislature is amply justified in *retaining* its historic statutory rape law because of the potentially devastating social and economic results which may follow its violation." *Id.* 159 Cal.Rptr. at 342, 601 P.2d at 574 (emphasis added). This is novel, but hardly a satisfactory substitute for sound constitutional law. It is first an admission that illegitimate teenage pregnancies were not any concern of the 1850 legislature which in its first such statute hinged the minimum under age at under 10 years, nor of the 1889 legislature which raised the proscribed age to under 14 years of age, nor of the 1897 legislature which advanced the age to 16 years, nor of the 1913 legislature which fastened on to the age of 18 years. It is secondly a startling innovation in the field of constitutional law to say, as does the four-member California majority opinion, that the legislative intent is gleanable from the fact that the legislature has "retained" the gender-discriminatory statute! It is so remarkable as to be beyond my comprehension, and to constitutional commentators and scholars I leave further discussion.

I will mention, however, that the various legislatures which have convened in Califor-

nia since 1850 had no reason to even doubt the infirmity of the statutory rape provision until the *Meloon* case was handed down in 1977.[8] Significantly the unanimous *Meloon* court included one United States district judge from California sitting with the First Circuit Court of Appeals by assignment. This factor places the California judges' overall score at four to four. The United States Supreme Court, in passing on the California court's "disastrous consequences of pregnancy rationale"—without showing any awareness of the content of the Mosk, Tobriner, and Newman dissent[9] also stands at four to four. The overall total, eight to eight. Not included, but entitled to weight, add onto the unconstitutional score, Judge Tuttle of the Fifth Circuit, and Chief Judge Coffin of the First Circuit, and the author of *Meloon*. Justice Blackmun did not accept the California court's rationale.

Decisions of the United States Supreme Court on federal constitutional questions are ordinarily binding throughout the state courts of the fifty states, but such is not true where a particular holding is only that of a plurality. A four-member decision of a nine-member court is, of course, but a plurality opinion; it is not binding, and only persuasive. Likewise only persuasive in this Court are the majority opinions of other state courts and federal circuit courts. Accordingly it is here the prerogative of an Idaho court passing upon the constitutionality of an Idaho statute to independently reach the right conclusion. I submit that students of the law will find more substance, more guidance, and more persuasion in the dissenting opinion of the California court; in the reluctant and questioning separate concurring opinion of Justice Blackmun, and in the dissenting opinion of Justices Brennan, White, and Marshall and of Justice Stevens.

Justice Brennan's opinion, which Justices White and Marshall joined, comes very close to espousing my own bewilderment at the California court's rationale that the constitutionality of a 130-year-old statute may be properly determined in light of what has transpired in recent years—what I choose to call as the doctrine of "retention"—an illegitimate statute left standing on the basis of having been "retained" when *later* events are said to justify its continued existence. Justice Brennan, while he did not directly attack the retention doctrine, was well aware that the pregnancy hypothesis of the California court was not justified:

"Until very recently, no California court or commentator had suggested that the purpose of California's statutory rape law was to protect young women from the risk of pregnancy. Indeed, the historical development of § 261.5 demonstrates that the law was initially enacted on the premise that young women, in contrast to young men, were to be deemed legally incapable of consenting to an act of sexual intercourse.[9] [10] . . . Be-

---

8. The *Michael M.* majority say of *Meloon* that "even the most cursory reading reveals . . . a statutory scheme quite different from that before us." 159 Cal.Rptr. 344, 601 P.2d at 576. I would suggest that that court ought not indulge in cursory reading where it is so apparent that other than in selection of words, the New Hampshire statutory rape provision is indistinguishable from that of California (and Idaho). The majority may have felt obliged to believe their scheme different in view of the United States Supreme Court having denied certiorari in *Meloon*, 436 U.S. 950, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978).

9. *Michael M. v. Superior Court*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981), opinion released March 23, 1981. The California Supreme Court opinion was released on November 5, 1979.

10. Footnotes 9 and 10 in Justice Brennan's opinion are:

"9. California's statutory rape law had its origins in the Statutes of Westminster enacted during the reign of Edward I at the close of the 13th century (3 Edw. 1, ch. 13 (1275); 13 Edw. 1, ch. 34 (1285)). The age of consent at that time was 12 years, reduced to 10 years in 1576 (18 Eliz. 1, ch. 7, § 4). This statute was part of the common law brought to the United States. Thus, when the first California penal statute was enacted, it contained a provision (Stats. 1850, ch. 99, § 47, p. 234) that proscribed sexual intercourse with females under the age of 10. . . .

"Because females generally have not reached puberty by the age of 10, it is inconceivable that a statute designed to prevent pregnancy would be directed at acts of sexual intercourse with females under that age.

cause their chastity was considered particularly precious, those young women were felt to be uniquely in need of the State's protection.[10][10] In contrast, young men were assumed to be capable of making such decisions for themselves; the law therefore did not offer them any special protection." 101 S.Ct. at 1217–18. Justice Brennan pointed to two serious flaws in California's assertion that:

"[L]aw enforcement problems created by a gender-neutral statutory rape law would make such a statute less effective than a gender-based statute in deterring sexual activity.

"First, the experience of other jurisdictions, and California itself, belies the plurality's conclusion that a gender-neutral statutory rape law 'may well be incapable of enforcement.' There are now at least 37 States that have enacted gender-neutral statutory rape laws. Although most of these laws protect young persons (of either sex) from the sexual exploitation of older individuals, the laws of Arizona, Florida, and Illinois permit prosecution of both minor females and minor males for engaging in mutual sexual conduct. Cali-

fornia has introduced no evidence that those states have been handicapped by the enforcement problems the plurality finds so persuasive. Surely, if those States could provide such evidence, we might expect that California would have introduced it.

"In addition, the California Legislature in recent years has revised other sections of the Penal Code to make them gender-neutral. For example, Cal.Penal Code §§ 286(b)(1) and 288a(b)(1), prohibiting sodomy and oral copulation with a 'person who is under 18 years of age,' could cause two minor homosexuals to be subjected to criminal sanctions for engaging in mutually consensual conduct. Again, the State has introduced no evidence to explain why a gender-neutral statutory rape law would be any more difficult to enforce than those statutes.

"The second flaw in the State's assertion is that even assuming that a gender-neutral statute would be more difficult to enforce, the State has still not shown that those enforcement problems would make such a statute less effective than a gen-

"The only legislative history available, the draftsmen's notes to the Penal Code of 1872, supports the view that the purpose of California's statutory rape law was to protect those who were too young to give consent. The draftsmen explained that the '[statutory rape] provision embodies the well settled rule of the existing law; that a girl under ten years of age is incapable of giving any consent to an act of intercourse which can reduce it below the grade of rape.' Code Commissioners' note, subd. 1, foll. Pen.Code, § 261 (1st ed. 1872, p. 111). *There was no mention whatever of pregnancy prevention.* See also Note, Forcible and Statutory Rape: An Explanation of the Operation and Objectives of the Consent Standard, 62 Yale L.J. 55, 74–76 (1952)." 101 S.Ct. at 1217

"10. Past decisions of the California courts confirm that the law was designed to protect the State's young females from their own uninformed decisionmaking. In *People v. Verdegreen,* 106 Cal. 211, 214–215, 39 P. 607, 608–609 (1895), for example, the California Supreme Court stated:

'The obvious purpose of [the statutory rape law] is the protection of society by protecting from violation the virtue of young and unsophisticated girls .... It is the insidious approach and vile tampering with their persons

that primarily undermines the virtue of young girls, and eventually destroys it; and the prevention of this, as much as the principal act, must undoubtedly have been the intent of the legislature.'

*As recently as 1964,* the California Supreme Court decided *People v. Hernandez, supra,* 61 Cal.2d, [529] at 531, 39 Cal.Rptr., [361] at 362, 393 P.2d, [673] at 674, in which it stated that the under-age female

'is presumed too innocent and naive to understand the implications and nature of her act .... The law's concern with her capacity or lack thereof to so understand is explained in part by a popular conception of the social, moral and personal values which are preserved by the abstinence from sexual indulgence on the part of a young woman. An unwise disposition of her sexual favor is deemed to do harm both to herself and the social mores by which the community's conduct patterns are established. Hence the law of statutory rape intervenes in an effort to avoid such a disposition.'

"It was *only in deciding Michael M. that the California Supreme Court decided for the first time in the 130-year history of the statute, that pregnancy prevention had become one of the purposes of the statute.*" 101 S.Ct. at 1217–18 (emphasis added).

der-based statute in deterring minor females from engaging in sexual intercourse. Common sense, however, suggests that a gender-neutral statutory rape law is potentially a *greater* deterrent of sexual activity than a gender-based law, for the simple reason that a gender-neutral law subjects both men and women to criminal sanctions and thus arguably has a deterrent effect on twice as many potential violators. Even if fewer persons were prosecuted under the gender-neutral law, as the State suggests, it would still be true that twice as many persons would be *subject* to arrest. The State's failure to prove that a gender-neutral law would be a less effective deterrent than a gender-based law, like the State's failure to prove that a gender-neutral law would be difficult to enforce, should have led this Court to invalidate § 261.5." 101 S.Ct. at 1216–17 (footnotes omitted).

Justice Stevens' dissent decries the Court's four-member plurality decision on the basis that it "seems to rest on the assumption *that the California Legislature acted* on the basis of that rather fanciful motion" (that risk of pregnancy was a built-in effective deterrent to voluntary engaging in the risk-creating conduct), 101 S.Ct. at 1219, a well-taken point, but one which is mispremised in accepting that the legislature had acted at all since 1913. The Legislature had done nothing in this area, and it was the California court which arrived at the novel conclusion that the Legislature had left the statute intact, in view of the Legislature's supposedly recent but unannounced alarm at teenage pregnancies.

Other than for that small discrepancy, Justice Stevens' opinion is his usual perceptively analytical approach to a constitutional question which in essence had already been decided in other cases, and here had only become befuddled by the California court's irrational rationale—adopted by the United States Supreme Court plurality. He drives his legal thesis home in a manner reminiscent of Will Rogers:

"In my judgment, the fact that a class of persons is especially vulnerable to a risk that a statute is designed to avoid is a reason for making the statute applicable to that class. The argument that a special need for protection provides a rational explanation for an exemption is one I simply do not comprehend.

"In this case, the fact that a female confronts a greater risk of harm than a male is a reason for applying the prohibition to her—not a reason for granting her a license to use her own judgment on whether or not to assume the risk. Surely, if we examine the problem from the point of view of society's interest in preventing the risk-creating conduct from occurring at all, it is irrational to exempt 50% of the potential violators. See Dissent of Justice BRENNAN, *ante,* at 1216–1217. And, if we view the government's interest as that of a *parens patriae* seeking to protect its subjects from harming themselves, the discrimination is actually perverse. *Would a rational parent making rules for the conduct of twin children of opposite sex simultaneously forbid the son and authorize the daughter to engage in conduct that is especially harmful to the daughter? That is the effect of this statutory classification."* 101 S.Ct. at 1219 (footnote omitted) (emphasis added).

From which point, he shortly thereafter continues:

"The question raised by this statute is whether the State, consistently with the Federal Constitution, may always punish the male and never the female when they are equally responsible or when the female is the more responsible of the two.

"It would seem to me that an impartial lawmaker could give only one answer to that question. The fact that the California Legislature has decided to apply its prohibition only to the male may reflect a legislative judgment that in the typical case the male is actually the more guilty party. Any such judgment must, in turn, assume that the decision to engage in the risk-creating conduct is always—or at least typically—a male decision. If that

assumption is valid, the statutory classification should also be valid. But what is the support for the assumption? It is not contained in the record of this case or in any legislative history or scholarly study that has been called to our attention. I think it is supported to some extent by traditional attitudes toward male-female relationships. But the possibility that such an habitual attitude may reflect nothing more than an irrational prejudice makes it an insufficient justification for discriminatory treatment that is otherwise blatantly unfair. For, as I read this statute, it requires that one, and only one, of two equally guilty wrongdoers be stigmatized by a criminal conviction." 101 S.Ct. at 1220.

In concluding, Justice Stevens writes words of wisdom that appellate judges should not lightly put aside:

"Finally, even if my logic is faulty and there actually is some speculative basis for treating equally guilty males and females differently I still believe that any such *speculative justification would be outweighed by the paramount interest in even-handed enforcement of the law. A rule that authorizes punishment of only one of two equally guilty wrongdoers violates the essence of the constitutional requirement that the sovereign must govern impartially."* 101 S.Ct. at 1221 (emphasis added).

Justice Mosk in writing for the dissenters on the California court declares, and neither the California court's four-member majority nor the United States Supreme Court plurality of four refute, that:

"Neither the Attorney General nor the majority offer any support for their theory that the prevention of pregnancy is or ever was among the purposes of section 261.5, and both the history and wording of the statute lead to a contrary conclusion." 159 Cal.Rptr. at 346, 601 P.2d at 578.

Following that passage he traced the evolution of the California statute, and passages from earlier California decisions clearly outlining what earlier courts saw as the legislative intent—much of which was picked up by the dissenters on the United States Supreme Court and need not be repeated. From that history and that case law he arrived at the inescapable conclusion to which any fairminded person will inevitably be drawn:

"In short, reducing illicit pregnancies among teenage girls may well be a laudable governmental objective, but it is wishful thinking to believe that the California statutory rape law was actually enacted or re-enacted for that purpose. Under the cases cited at the outset, therefore, it may not properly be invoked to save the statute. (See, e.g., *Arp* [v. *Workers' Comp. Appeals Bd.*], at p. 404 of 19 Cal.3d [395], 138 Cal.Rptr. 293, 563 P.2d 849; *Weinberger* [v. *Wiesenfeld*] at p. 648 of 420 U.S. [636], 95 S.Ct. 1225 [at p. 1233, 43 L.Ed.2d 514].)" 159 Cal.Rptr. at 348, 601 P.2d at 580.

Giving proper consideration to the majority's pregnancy prevention thesis, he demolished it:

"Even if the purpose of the statute were pregnancy prevention, therefore, its practical effect is to perpetuate the age-old stereotype we recognized in *Hernandez* (at p. 531 of 61 Cal.2d, at p. 362 of 39 Cal.Rptr., at p. 674 of 393 P.2d), i.e., that the underage female 'is presumed too innocent and naive to understand the implications and nature of her act.' As seen by the public in actual operation, section 261.5 assumes that when the minor female 'volitionally' decides to be sexually active, she does not really know what she is doing. *Because she is a woman* she is deemed inherently less capable of knowing the facts, of controlling her emotions, of weighing the risks and benefits, and of making intelligent choices—in short, she is less responsible for her actions—than her male counterpart. As it presently reads, the California statutory rape law thus reflects a belief that the minor female is in need of special protection not only against the male but also against herself, against her 'voluntary' but presumptively imprudent decisions in matters of sex.

"Such notions are obviously vestiges of a bygone era, remnants of the exploded myth of intrinsic male superiority. They are the product of conventional sex-stereotypical thinking, and revive an outmoded patriarchial view of 'the woman's role.' Certainly it is permissible for the Legislature to enact statutes for the protection of the moral character of minors of both sexes, and in particular to prevent their sexual exploitation by persons older and more mature than they; but absent a compelling reason for doing so, equal protection forbids the law to foster one standard of socially acceptable conduct for males and another for females. By limiting the definition of the crime 'to situations in which the offender is a male and the victim a female, [statutory rape laws] are providing only an incomplete and unsatisfactory protection. At the same time, they are lending their support to society's pernicious and hypocritical double standard of sexual morality.' (Kanowitz, Women and the Law (1969), p. 25.) Such considerations not only fail to justify the discrimination of section 261.5, they reinforce the argument for holding it unconstitutional.

"Central to the equal protection clause is the principle that each individual, regardless of sex, is to be treated as an equal, fully participating, and responsible member of society. (See Karst, *The Supreme Court 1976 Term—Foreward*:

*Equal Citizenship Under the Fourteenth Amendment* (1977) 91 Harv.L.Rev. 1.) When a legislative classification perpetuates sexual stereotypes it imposes inequalities that stigmatize women and thereby undermine this principle of equal citizenship. As the United States Supreme Court recently explained in striking down a statutory scheme providing that husbands but not wives may be required to pay alimony upon divorce, 'Legislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing the stereotypes about the "proper place" of women and their need for special protection. [Citation.] Thus, even statutes

purportedly designed to compensate for and ameliorate the effects of past discrimination must be carefully tailored. Where, as here, the State's compensatory and ameliorative purposes are as well served by a gender-neutral classification as one that gender-classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex.' (*Orr v. Orr* (1979) 440 U.S. 268, 283, 99 S.Ct. 1102, 1113, 59 L.Ed.2d 306.)" 159 Cal. Rptr. at 350–51, 601 P.2d at 582–83 (footnote omitted).

A summing up of the constitutional issue is really not necessary. At a glance it is apparent that the California majority-four and the United States Supreme Court plurality-four have not in the slightest offered any refutation to the documented and well-reasoned dissents. Nor could they do so. Being unable, no attempt was made. It would seem to me that the Idaho Supreme Court would come out with a well-reasoned opinion which, no matter how it held, did something better than to blindly follow a California decision which cannot in the least be justified. To adopt the California view is to henceforth decide all statutory constitutional issues not on the basis of what the legislature intended in enacting legislation, but on sheer judicial surmise that the legislature's inaction in retaining a statute is demonstrative of its intent. Most practitioners and scholars will see this as an absurdity in any circumstances, but especially when the legislature is not even shown to have known that its statute was impermissibly discriminatory.

I return to the views of Justice Stevens for a proper passage with which to conclude:

"I would have no doubt about the validity of a state law prohibiting all unmarried teenagers from engaging in sexual intercourse. The societal interests in reducing the incidence of venereal disease and teenage pregnancy are sufficient, in my judgment, to justify a prohibition of conduct that increases the risk of those harms." 101 S.Ct. at 1218.

866

I agree adding only that recent reports of the startling spread of a gonorrhea bacteria which does not respond to penicillin, and the newly discovered herpes disease, suggest the urgency for having a *valid* constitutional amendment as the Justice suggests.

### IV.

Improper prosecutorial comment is not a new problem. Four years ago in *State v. Smoot*, 99 Idaho 855, 590 P.2d 1001 (1978), the Court responded to a contention that the prosecutor had gone too far in his closing argument in interjecting his own personal views with a "caution [to] prosecutors to exercise more care in addressing the jury during argument . . . ." 99 Idaho at 860, 590 P.2d at 1006. In *State v. Sharp*, 101 Idaho 498, 616 P.2d 1034 (1980), where the prosecutor in final argument placed his own personal integrity in issue by instructing the jury that if it believed that law enforcement (including himself) framed the defendant, it should acquit the defendant without even picking a foreman for the jury, 101 Idaho at 516, 616 P.2d at 1053, the Court held that the remarks were erroneous, but omnisciently concluded that such error did not prejudice the rights of the defendant. 101 Idaho at 508, 616 P.2d at 1044. In *State v. Griffiths*, 101 Idaho 163, 610 P.2d 522 (1980), where the prosecutor's closing argument referred to facts not in evidence, and portrayed the defendant as having deliberately planned and carried out the murder in a cold and calculating manner, firing shots into a helpless victim pleading for mercy, which conduct the Court was willing to "assume" was "egregious, unprofessional and reprehensible," 101 Idaho at 166, 610 P.2d at 525 (remarks appendicized at page 184 of 101 Idaho and page 543 of 610 P.2d), such remarks were held to not warrant reversing a conviction on the lesser charge of manslaughter. 101 Idaho at 167, 610 P.2d at 526. No caution against such prosecutorial conduct was extended.

With those prefatory remarks out of the way, we have for our consideration in LaMere's case the prosecutor's final thrust at the defendant (who wouldn't cooperate by pleading guilty), that the defendant "took her virginity."

Before delving further into an assessment of such a statement, it is necessary to set the stage by giving consideration, as the Court's opinion does not, to the prosecutor's *in limine* motion, found in Volume 2 of the Reporter's Transcript beginning at p. 87. This motion was made during trial and shortly after defense counsel had commenced his cross-examination of the girl involved:

"THE COURT: . . . Did you have a Motion you wanted to make?

"MR. ROSE: Yes, Your Honor.

"Comes now the State and moves the Court for an Order in Limine restricting the defendant in any further cross examination of the victim regarding her past sexual conduct.

"I would inform the Court the State intends to present scientific evidence that sperm and semen was present in her vagina.

"Now, *Mr. Watson I think* under the Rules of Idaho *might have the possibility to inquire into previous sex contact say within 72 hours prior to this event* to show that the deposits of sperm or semen may have been made by someone else.

"But with the victim's testimony yesterday that she had never done anything like this before, further inquiry along that line would be improper I submit to the Court.

"I would also like to raise the point about foundation before we start getting into some impeachment, which I think Mr. Watson probably is going to do.

"I would like to have those set forth clearly before we get into the questions, something that should not be insinuated in this matter.

"MR. WATSON: Your Honor, if I may respond to the Prosecutor's Motion this morning, I believe his initial Motion is well taken. And so as far as the possible description under Idaho Code 18–6105 on past sexual conduct of the prosecuting witness, *we do not intend nor can we*

*prove by her testimony or that of any other individual she has engaged in any prior sexual conduct.*

"I would like to assure the Prosecutor *we don't intend to bring any testimony in to that effect,* and I don't intend to question her on that.

"THE COURT: Let the record reflect that the Court would, in light of the statements and so forth, the *Court would limit any inquiry into the area of prior sexual conduct of the prosecuting witness,* unless there is a hearing held outside the presence of the jury and we determine whether or not it's relevant under these proceedings." (Emphasis added.)

Extremely critical to an appellate assessment of the prosecutorial virginity comment is the timing. Of any 100 trial lawyers of more than limited trial experience, 100 will see the timing of the virginity remarks as creating irreparable harm, and beyond the aid of any objection or instruction. Where the prosecutor in opening his final summation was moderate and proper:

"We have to prove that there was sexual intercourse. The evidence that we have submitted to you shows that sexual intercourse is mainly and mostly Carol's testimony. She came here before you, told you all about the events in her life. You saw her. Was she lying to you that she had intercourse on that night?",

in his closing remarks, with the clock winding down and only ten or fifteen seconds left before the jury would retire, the prosecutor abruptly departed from a nearly legitimate discussion of the pubic hair evidence to go beyond all bounds of propriety and in direct contravention of the *in limine* order which he had had the court invoke against defense counsel. The full content of the last words the jury would hear before retiring to deliberate is something more than the brief excerpt in the Court's opinion. What he said was:

"It was his hair in her pants, in the car. Corroboration may tend to establish the crime and make it probable. The fact that those hairs can't be identified as

certain as a fingerprint doesn't destroy the corroboration, corroborating ability of those hairs in her pants that belonged to Mr. LaMere.

"*Look at him. You have to find him guilty.* You have to be the judges here. And I submit to you, Ladies and Gentlemen, that the evidence in this case is beyond reasonable doubt and is sufficient for you to find him guilty.

"*He took that little girl out there in that dark alley and wallowed around in the filth of that car and took her virginity away from her.* And during the whole thing he said it was better in prison. It makes me sick.

"Justice needs to be done here. And in the interest of justice, I submit to you folks that Mr. LaMere has been proven—a sufficient amount of proof—guilty of the crime of rape. Thank you."

Although the Court in its opinion is able to "assume" without deciding that the prosecutor's dramatic finale was improper and hence prosecutorial error, I am not so inhibited. Nor is it expected that trial attorneys will have any reservations whatever. Being a breach of the *in limine* order which the prosecutor obtained from the court, which is bad enough, such comment transgressed all bounds of propriety. The virginity of the girl, or lack thereof, was not an issue in the case, and there was *no* medical testimony offered or admitted in that regard. The only logical explanation is that the prosecutor, whose forcible rape case was apparently decimated by the suppression ruling, and whose statutory rape case against the defendant hinged solely on the credibility of the extremely promiscuous girl, unfortunately indulged in unrestrained theatrical oratory aimed at turning the jury against the defendant. One may be certain that such was the effect obtained. Even if the achieved effect is debatable, a hardly probable proposition, the issue must be resolved in favor of reversing the conviction.

A jury which has been incited to passion, and perhaps to prejudice as well, cannot function as a fair and impartial jury. I mention prejudice because it sticks in my

recollection that from somewhere in the record I ascertained that the defendant is not a white caucasian—making all the more damaging that the jury, selected from a county population which may be almost 100% white, was by the prosecutor directed seconds before they would retire to cast their eyes on a defendant accused of having intercourse with a young white girl, taking from her virginity and also told they *had* to find him guilty.

The Court in its opinion restricts a disclosure of the prosecutor's remarks to the taking of the girl's virginity, which the Court manages to rationalize as the equivalent of improperly admitted evidence—from which it is said to follow that if such is excised, and the Court can say beyond a reasonable doubt that a conviction would have been reached without it, the error is harmless.

The fallacy in this rationale is the total failure to comprehend the vast difference between, on the one hand, evidence improperly admitted and, on the other hand, inflammatory comments used to turn on the passion and bring out the prejudice. Obviously as everyone connected with the case knew, and as the prosecutor had insisted with his *in limine* motion, the girl's previous sexual history had nothing whatever to do with the charge against the defendant predicated on the immutable fact that the girl's age was only 14 years. The Court engages

in an untenable exercise in its resolution of the issue by treating the improper comment as evidence.

The real issue, and the only issue regarding the language used, is its inflammatory effect on the jury. If the prosecutor simply went overboard or was otherwise inarticulate (which does not appear to be the case) and had no improper intentions, nevertheless it is inescapable that that final exhortation to the jury could not have otherwise but inculcated passion and prejudice against the defendant. If the prosecutor intended the consequences of his conduct, so much the worse.

The prosecutor's conduct clearly transcended most if not all of the American Bar Association Standards for Criminal Justice, set forth in the Court's unanimous opinion in *State v. Garcia,* 100 Idaho 108, 594 P.2d 146 (1979),[11] and was an especially gross violation of the interdiction against playing to passion or prejudice, and thereby completely vitiating the jury process and the federal and state constitutional safeguards to a jury trial by an impartial and unprejudiced jury.[12]

The hypothesis of the Court's opinion— that a prosecutor's last-second appeal to arouse the passions and prejudice of the jury against the defendant is akin to improperly admitted evidence, thereby enabling this Court on its review to decide for

---

**11.** Those four standards applicable to argument to the jury are set forth again for the benefit of those who have not read *Garcia.*

"(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant....

"(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

"(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the conse-

quences of the jury's verdict." 100 Idaho at 110, 594 P.2d at 148 (emphasis omitted).

**12.** "Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character, and right and justice shall be administered without sale, denial, delay, or *prejudice.*" Id.Const. art. 1, § 18. (Emphasis added.)

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." U.S. Const.amend. VI. (Emphasis added.)

itself whether any reasonable jury without the "evidence" would have nevertheless convicted the defendant is without substance. This test was applied in *State v. LePage,* 102 Idaho 387, 630 P.2d 674 (1981), where the issue was *evidence* obtained and introduced in violation of the *Massiah* rule, *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), BUT the State here does not rely upon *LePage.* Rather it relies upon *State v. Garcia,* 100 Idaho 108, 594 P.2d 146 (1979), which *is* a prosecutorial misconduct case. The State correctly observes the distinction, and correctly refers this Court to the right rule. *Garcia* did not involve a prosecuting attorney's last-ditch remarks to arouse a jury, but merely his (impermissibly given) opinion as to defendant's credibility. A unanimous Court in *Garcia* stated the issue, and stated the rule which the State urges we should apply here:

> "It is clear that it was error for the prosecutor to express his personal opinion or belief as to the falsity of Garcia's testimony. The state, however, contends that such error does not rise to the level of prejudicial error in light of the overwhelming evidence presented at trial as to Garcia's guilt.
>
> "We stated in *State v. Spencer,* 74 Idaho 173, 184, 258 P.2d 1147, 1154 (1953):
>
> " 'Where the issue of guilt is debatable or it appears from the record that the jurors could have reasonably entertained doubt as to the defendant's guilt and that misconduct of the prosecuting attorney might well have influenced the result, a conviction will be reversed.'
>
> "In the recent case of *State v. Smoot, supra,* when presented with the issue of whether prosecutorial misconduct in closing argument constituted prejudicial error or harmless error, this Court applied a standard similar to the one utilized in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) as follows: 'an appellate court must . . . declare a belief, beyond a reasonable doubt, that there was no reasonable possibility that such evidence complained of contrib-

uted to the conviction.' 590 P.2d at 1007. The purpose of a harmless error rule is to ' "block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the results of the trial".' *State v. Smoot, supra* [590 P.2d] at 1007, *quoting with approval, Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, [827] 17 L.Ed.2d 705 (1967)." 100 Idaho at 111, 594 P.2d at 149.

The State is undoubtedly aware of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), where prosecutorial misconduct was compared to a coerced confession:

> "And though the case in which this occurred presented a reasonably strong 'circumstantial web of evidence' against petitioners, [*People v. Teale*] 63 Cal.2d [178] at 197, 45 Cal.Rptr. [729] at 740, 404 P.2d [209] at 220, it was also *a case in which, absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts. Under these circumstances, it is completely impossible for us to say that the State has demonstrated, beyond a reasonable doubt, that the prosecutor's comments* and the trial judge's instruction *did not contribute to petitioners' convictions.* Such a machine-gun repetition of a denial of constitutional rights, designed and calculated to make petitioners' version of the evidence worthless, can no more be considered harmless than the introduction against a defendant of a coerced confession." 87 S.Ct. at 829.

Neither the State's brief nor the Court's opinion suggest any authority for the proposition that a fair trial has been had when the verdict is tainted by the jury's exposure to inflammatory rhetoric. The remarks of the *Chapman* prosecutor, quite lengthy and involving many witnesses, 87 S.Ct. at 829–36, essentially did not go beyond driving home to the jury the failure of those defendants to take the stand. No outright attempt to inflame the jury was made, yet the Court was not tolerant of infraction, and reversed the conviction. On the other

hand, the prosecutor in this case in a few swift sentences, almost as the jury was turning toward the door of the jury room, said the very words which would put the defendant in the worst possible light. Is what he said in actuality any different from this: "Look at that dark-skinned s-o-b. He took that little 14-year-old white girl's virginity. *You have to convict him.*"

*Garcia* teaches that the purpose of harmless error is "to block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the results of the trial." *Garcia,* 100 Idaho at 111, 594 P.2d at 149. Three weeks after *Garcia,* we applied those same principles in *State v. Stewart,* 100 Idaho 185, 595 P.2d 719 (1979):

> "Before the prosecutor referred to the alleged statement of Thomas, the testimony of Stewart that he had not 'cased' the furniture store was directly contradicted only by the testimony of co-defendant Patrick Lane. Thus, the introduction of Thomas' inculpatory statements disrupted the testimonial equipose that was then existing on this crucial element of the appellant's defensive theory. *Because of this, we are unable to declare a belief beyond a reasonable doubt, that there was no reasonable possibility that the use of Thomas' alleged statement contributed to the conviction.* See, State v. Smoot, [99 Idaho 855] 590 P.2d 1001 (Idaho 1978); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Lewis v. Texas, supra [521 S.W.2d 609 (Tex.Cr.App.1975)]. The conviction is reversed and remanded for a new trial." 100 Idaho at 187, 595 P.2d at 721 (emphasis added).

For one I am wholly unable to see the prosecutor's remarks as a small defect having had no or little effect on the jury's verdict. As the Court did in *Stewart* —having perused the entire record, as the harmless error rule requires that we do, I am unable to declare a belief beyond a reasonable doubt that there is no reasonable possibility that the prosecutorial misconduct contributed to the conviction.

Nor do I see any rationale under which the others on the Court can say otherwise. Not mentioned in the Court's opinion is the fact that the jury required almost four hours to determine the single issue of fact: Did the defendant have sexual intercourse with the 14-year old girl? The whole issue was her credibility on that crucial point. No contention was made that she was 18 years old or over. As the prosecutor said, her credibility was the focal point. Her credibility was certainly open to question. Not open to question, nor questioned by defense counsel, was that she had had intercourse with someone. But was it all that clear that defendant LaMere was indeed the culprit? The Court's opinion glosses over some rather critical facts in its review of the evidence.

The Court accurately notes that she crawled out of her bedroom window, but then merely recites that after the alleged rape, the defendant took her home at which time she told her parents about being raped. Significantly missing in the recitation is that the girl's return into the home was also by crawling in the window—and that in both instances, going at 2:30 a.m. and returning at 5:30 a.m., she was not only crawling in and out but *sneaking in and out.* On her reentry, she was accosted by her mother, and it was *then* when she was in need of something to take the heat off her that the histronics began, and she turned the heat from her by turning it against the defendant. This is not to decide at this level whether the defendant did or did not engage her in sexual intercourse— but it is to submit that her motives were a proper concern for a deliberating jury. To the mind of any juror her motives on being accosted would be of some consequence in passing upon her credibility, which is not to say that her story might not be believed.

Other nonclusive evidence is that dealing with pubic hair. Above I intimated that the prosecutor here was nearly legitimate in his closing remarks to the jury. Although he did transgress to some extent in telling the jury that defendant's hair was in her pants, he did conclude, as the expert testimony required that he do, that hair identifi-

cation is not as certain as fingerprint identification. In his opening of final summation the prosecutor made no such concession. Defense counsel then argued, and the record sustains him:

"Now, what is the bottom line of all this expert testimony? The bottom line, Ladies and Gentlemen, is that there was some hairs that were found on Carol and in the car that could be Ernie's; could. They appeared to have a similar origin.

"And the criminalist Ann Bradley testified directly that the tests have their limitations. They can't say that these hairs belong to Mr. LaMere. They could belong to anybody. All she could say was that they were similar.

"She testified that hair comparisons are not like fingerprint comparisons where they can say that this fingerprint belongs to that individual. The two tests are totally different."

Another feature of the pubic hair evidence which had to be a legitimate jury concern was the not inconsequential discrepancy in the hair count which is mentioned in the Court's opinion. Nurse LaShaw sealed an envelope into which she had placed four hairs, but Anne Bradley, the criminologist, opened the envelope and examined five hairs. Of this the Court says, "Considering the fragile nature of the hairs, it was entirely possible that one could have broken into two pieces." My close perusal of the record produces nothing to substantiate this statement. I do find in the State's brief that exact statement, State's Brief, p. 29, offered only as the author's sheer and unsupported speculation immediately after having noted, which *is* supported by the record, "that Nurse LaShaw was mistaken as to how many hairs she put into the envelope." State's Brief, p. 29. The jury heard the court admit the hairs as evidence, noting that the discrepancy, that is, the question of where the fifth hair came from, could "*affect the weight to be given to that evidence.*" (Emphasis added.) Again, this is only to say that that jury in its deliberations would have had a legitimate concern with the accuracy of pubic hair testimony, as a generality, and also a concern, with the weight to give to it in view of the serious discrepancy. That which the trial court properly observed as going to the weight, cannot so easily be overridden by an appellate court's speculation that four hairs in a sealed envelope somehow split into five. But the point is not so much that as to question the "overwhelmingly conclusive evidence" which the Court manages to find as it applies the wrong harmless error test.

As the State itself urges, *Garcia* sets forth the proper test, and the legitimate concern here is with prosecutorial rhetoric which necessarily was intended to and could so readily inflame one or more white jurors against the defendant. There is no reason to bother with other disputed evidence, other than to say that there was for certain not the quantum of conclusive evidence here to justify the Court in its application of the wrong test. For an appellate court, making the proper harmless error test to block out small inconsequential irregularities, it becomes impossible to see that the case against the defendant was so strong that it can be said beyond a reasonable doubt that the prosecutor's remarks had no effect upon any one or more of twelve jurors and did not contribute to the verdict—not where the jury required four hours of deliberation before they did fix guilt upon the defendant.

Most trial lawyers will appreciate the language of the *Chapman* court in its application of the proper test for appellate courts in considering prosecutorial misconduct in final arguments:

"Applying the foregoing standard, we have no doubt that the error in these cases was not harmless to petitioners. To reach this conclusion *one need only glance at the prosecutorial comments . . . .*" *Chapman v. State of California,* 87 S.Ct. at 828.

### SUMMARY

(1) The amendment to the information should not have been allowed.

(a) A prosecutorial apology is not the equivalent of the showing which should have been made where the case was one working day short of going to trial on the charge of forcible rape.

(b) An inquiry into the prosecutorial delay would have exposed the prosecutorial vindictiveness against a defendant whose counsel had successfully obtained a suppression order, and against a defendant who would not plead guilty.

(c) As was initially the trial court's main concern, and as is the law, statutory rape is not the same offense as forcible rape, for which reason the defendant was denied his constitutional right to be held to answer both charges only upon a preliminary hearing, and not upon a prosecutor's information.[13]

(2) At the time the prosecutor declined to file a charge for statutory rape, existing

---

**13.** The Court's opinion, footnote 4, suggests that "[t]he defendant argues on appeal only that his rights were prejudiced by the amendment and does not argue before this Court that the amendment charged a new offense." This is not readily understood. Defendant's opening brief on page 2, after mention of the suppression order, reads as follows:

"On March 2, 1979, one (1) working day before the trial of this cause was to begin, the Plaintiff-Respondent filed a motion requesting leave to file an Amended Information *alleging an additional subsection of the rape statute* .... Over the strenuous objections of the Defendant-Appellant the Court entered an Order on the 2nd day of March, 1979, allowing the State to file such an Amended Information." (Emphasis added.)

I note also that Judge Towles had no trouble understanding defendant's objection, and in fact leaned toward defendant's position until misled by the *Blankenship* case.

"THE COURT: Well, *the original Complaint charges the crime of Forceable Rape.* Now, if the Amended Information was allowed, we've got not only Forceable Rape but Statutory Rape.

MR. ROSE: I think it would be a lesser included in any event.

THE COURT: Lesser included?

MR. ROSE: Forceable Rape.

MR. WATSON: I would take contention with that. It's a totally different type of offense.

MR. ROSE: You certainly have Forceable Rape on a person even though she is below 18 years old. The fact she is 14 years old is highly relevant in this case.

THE COURT: It carries the same penalty for any of the acts of rape. *I don't see how it could be considered a lesser included offense.* Well, that's what disturbs me is this problem of—I've always considered in my own mind the offense of Statutory Rape, of course, only required proof of penetration or intercourse and proof of age. For the Forceable Rape it not only required the proof of penetration but also proof of lack of actual consent, *which are two different things.* It seems to me— I would like to do some more looking into this thing before I make any determination of that matter. And I would think that it probably would not necessarily be the question of surprise as much as *the question of whether*

or not the defendant has already been bound over on one charge and is now being expected to answer another one at the time of the trial. I wouldn't feel very comfortable at this point without really doing some research on it." (Emphasis added.)

The allowing of the amendment is defendant's first enumerated assignment of error; it is fortified by points and authorities I, II, III, IV, and V, and discussed adequately in argument— driving home the point that charges of forcible rape and statutory rape consist of different elements. Defendant-appellant's Brief, pp. 3, 5, 6, 7, and 18. Both defense counsel's and Judge Towles' initial reaction were correct, and a lengthy dissertation was hardly required:

"The statutory definition of forcible rape is not to be confused with what is commonly called 'statutory rape,' that is, sexual intercourse with a girl under the age of consent as defined by statute." 65 Am.Jur.2d, Rape § 1, p. 762 (1972).

"In practically all American jurisdictions, carnal knowledge of a female under a stated age, with or without her consent, is made a crime by statute. In some states the statutory offense is denominated 'rape'; generally, however, it is known as 'statutory rape,' to distinguish it from the common-law offense of forcible rape. The two crimes are essentially different. In the crime of commonlaw rape, force and resistance are essential ingredients, while in statutory rape they are not essential and may be present or absent without affecting the criminality of carnal knowledge. The purpose of these statutes it to protect young girls from illicit acts of sexual intercourse by making their consent legally impossible. However, a husband's sexual intercourse with his wife subsequent to marriage is usually not statutory rape although she is, at the time, a female under the statutory age of consent." 65 Am.Jur.2d, Rape, § 15, pp. 769–70 (1972) (footnotes omitted).

Just six years ago the Pennsylvania Supreme Court dealt with the exact question.

"[U]nder the statute, intercourse may be the offense of statutory rape only if the female is under the age of sixteen and has consented; however, all intercourse procured by force against the victim's will, regardless of the victim's age is the crime of rape. In sum, a

case law was largely to the effect that Idaho's statute was unconstitutional, and, properly viewed it is unconstitutional.

(3) Application of any harmless error doctrine, even the wrong doctrine utilized in the Court's opinion, requires reversal for inflammatory prosecutorial rhetoric.

(a) Prosecutors are vested with an awesome degree of discretion. Most of them, I would estimate 90%, are not unaware of this, and respect their obligation to see that the criminally accused are accorded the fair trial to which all are entitled. There is no reason why all prosecutors cannot be just as fair and impartial as judges are required to be. Prosecutors and district judges are equally judicial officers under our Constitution. Prosecutors simply cannot allow themselves to indulge in any practice which defeats the administration of criminal justice.

(b) It is time to consider a non-partisan election of prosecuting attorneys, thus establishing for certain that they are the judicial officers the Constitution declares them to be.

## APPENDIX

### IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF SHOSHONE

| | | |
|---|---|---|
| THE STATE OF IDAHO, | ) | CASE NO. 12613 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM DECISION |
| | ) | AND ORDER ON MOTION |
| ERNEST GENE LaMERE, | ) | TO SUPPRESS STATEMENT |
| | ) | |
| Defendant. | ) | |

On October 23rd, 1978, at 5:05 a.m., Kellogg Police Officer Wadsworth arrested the defendant for "questioning" in regards to a rape. He was transported to the police station and booked, during which time the defendant made certain voluntary statements not in response to any questioning by the police officer.

Later on in the morning the defendant was read his *Miranda* Rights by the Chief of Police and Officer Wadsworth, but said *Miranda* Warning was not set forth in writing or otherwise recorded. At that time the officers questioned the defendant.

Defendant was then placed in a cell and at about 4:35 p.m. again was brought out by Officer Yon and Officer Crawford. At that time the officers made a tape recording, which included, at the outset, the *Miranda* Warning and the acknowledgment by the

female's consent to sexual intercourse excludes the possibility of a conviction for the offense of rape and makes the act of intercourse criminally cognizable only if the consenting female is under the age of sixteen. On the other hand, lack of the female's consent excludes the possibility of a conviction for statutory rape but is criminally cognizable as the crime of rape if the nonconsensual intercourse was initiated through the use of force." *Commonwealth v. Walker*, 468 Pa. 323, 362 A.2d 227, 231–32 (1976) (footnote omitted).

The Pennsylvania court, seeing its subsections as requiring a conviction for either forcible rape or for statutory rape, but not both, nevertheless said, as would be true in the case at bar, "[T]here may well be situations where it is necessary and proper to charge *both crimes* as alternatives." 362 A.2d at 232 n. 5 (emphasis added).

In our case, however, the prosecutor sought too late, improperly, and without excuse to add his alternative charge of statutory rape.

defendant that he understood his *Miranda* rights. A statement was then taken from the defendant on the tape recorder, and defendant then was transported from Kellogg to Wallace, Idaho, a Complaint was laid before the Magistrate and he was arraigned at 5:05 p.m., on October 23rd, 1978.

The officers testified that they had other duties to perform during the daytime hours, including transporting the victim to Coeur d'Alene for a physical examination and other routine matters.

Defendant contends that the failure to comply with I.C. 19–853(e) invalidates the statements made by the defendant while in police custody on October 23rd, 1978, and furthermore, the delay in taking the defendant before a Magistrate in violation of Idaho Code Section 19–615 and Idaho Criminal Rule 5(a) deprive such statements of the necessary voluntariness required by the constitution and statutes of the United States and this state.

The State, on the other hand, contends that the delay in arraignment was reasonable, that the requirements of I.C. 19–853 only pertain to questioning after the Court had determined the defendant was a needy person, but that in any event the recording of the *Miranda* Warning and statement complied with the requirement of said statute.

"When an arrest is made without a warrant by a peace officer or a private person the person arrested must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the arrest is made, and an information, stating the charge against the person must be laid before such magistrate." I.C. 19–615.

As to the requirements of notifying the defendant of his right to counsel, Idaho Code Section 19–853 provides in part as follows:

"If a person who is being detained by a law enforcement officer, or who is under formal charge of having committed, or is being detained under a conviction of a serious crime, is not represented by an attorney under conditions in which a person having his own counsel would be entitled to be so represented, the law enforcement officers concerned, upon commencement of detention, or the court, upon formal charge, as the case may be shall:

(1) clearly inform him of his right to counsel and of the right of a needy person to be represented by an attorney at public expense; and

(2) if the person detained or charged does not have an attorney, notify the public defender or trial court concerned, as the case may be, that he is not so represented. . . .

\* \* \* \* \* \*

(e) Information given to a person under this section is effective only if:

(1) it is in writing or otherwise recorded;

(2) he records his acknowledgment of receipt and time of receipt, or, if he refuses to make this acknowledgment, the person giving the information records that he gave the information and that the person informed refused to acknowledge it; and

(3) the material so recorded under (1) and (2) is filed with the court next concerned."

Contrary to the State's contention I.C. 19–853 clearly pertains to any defendant, whether needy or not, and is one of the warnings mandated by *Miranda*. The Idaho statute adds an additional requirement to the *Miranda* case and was designed to ensure the fact that the warning could be proved as well as the acknowledgment and understanding by the defendant.

At any time that a person is arrested or in custody and is questioned prior to arraignment before the Court, it is absolutely imperative that the police officers comply with Subsection (e) of I.C. 19–853.

As to the statement taken from the defendant at or about 4:35 p.m., on October 23rd, 1978, it is apparent that the *Miranda* Warning and acknowledgment of the warning was contained on the taped statement and that the tape of such statement was filed with the Court next concerned at the time of the suppression hearing.

However, it certainly would be more preferable for a written *Miranda* Warning to be acknowledged in accordance with the statute to further support the voluntariness of such statement. The original interview by the Chief of Police and Officer Wadsworth, of course, did not comply with the statutory requirement in any fashion, and as a result, such statement must be suppressed.

The next serious question involves the delay between the arrest and presenting the matter to a Magistrate for arraignment.

> "The voluntary character of a confession obtained prior to arraignment is placed in doubt when there is an unreasonable delay between arrest and arraignment, however, the confession is not per se inadmissible." *State v. Wyman,* 97 Idaho 486 [547 P.2d 531]

As to the delay in arraignment, it is the Court's opinion that there was no reasonable excuse nor was the delay itself reasonable. If the police officer had probable cause to arrest the defendant, he also had sufficient probable cause to present the facts to a Magistrate for the issuance of a Warrant of Arrest and to permit the Magistrate to fix bond, if appropriate. Therefore, the excuse that the officers were too busy or were gathering additional evidence and therefore could not take the defendant before the Magistrate, is not credible. If further evidence needed to be secured, the arrest should not have been accomplished.

This lends credence to the defendant's argument that the delay was for the purpose of obtaining a statement more than for any other reason, and cannot be condoned by the Court as a clear violation of the duty of a police officer to present an accused before a neutral and detached Magistrate "forthwith". The day in question was a Monday and the Court was open and available.

The Court therefore concludes that any statement volunteered by the defendant at the time of the initial booking would not be suppressed, but the violation of I.C. 19–853 would invalidate the subsequent interrogation of the defendant by the Chief of Police and Officer Wadsworth, and the delay in taking the defendant before a Magistrate would dictate a finding that the taped interview at 4:35 p.m. was not voluntary on the part of the defendant, and hence, may not be used at the time of the trial.

BE IT SO ORDERED.

DATED at Wallace, Idaho, this 21st day of February, 1979.

s/James G. Towles
JAMES G. TOWLES
District Judge